

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-29-2002

# USA v. Boone

Precedential or Non-Precedential:

Docket 99-5439

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"USA v. Boone" (2002). *2002 Decisions.* Paper 61.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/61

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed January 29, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 99-5439/5695/5894

UNITED STATES OF AMERICA

v.

LARRY BOONE,

        Appellant No.: 99-5439

UNITED STATES OF AMERICA

v.

THOMAS WESTON, aka Rasul

        Thomas Weston,
        Appellant No.: 99-5695

UNITED STATES OF AMERICA

        Appellant No.: 99-5894

v.

THOMAS WESTON, aka Rasul

On Appeal and Cross-Appeal from the Judgment of
Conviction and Sentence of the United States District
Court for the District of New Jersey
(Crim. No. 99-cr-00358)
District Judge: Hon. Garrett E. Brown, Jr.

Argued: September 15, 2000

Before: ROTH, McKEE and RENDELL, Circuit Judge s

(Opinion Filed: January 29, 2002)

DAVID E. SCHAFER, ESQ. (Argued)
Assistant Federal Public Defender
22 South Clinton Avenue
Station Plaza #4, 4th Floor
Trenton, New Jersey 08609
Attorney for appellant Boone
in No. 99-5439.

DAVID L. RHOADS, ESQ. (Argued)
311 White Horse Avenue, Suite A
Trenton, New Jersey 08610
Attorney for Appellant
Weston in No. 99-5695 and
cross-appellee in No. 99-5894

ROBERT J. CLEARY, ESQ.
United States Attorney
NORMAN GROSS, ESQ. (Argued)
Assistant United States Attorney
United States Attorney's Office
Camden Federal Building and
United States Courthouse
P. O. Box 2098
Camden, New Jersey 08101
Attorneys for appellee in
Nos. 99-5439/5695 and
cross-appellant in No. 99-5894

OPINION OF THE COURT

McKEE, Circuit Judge.

A jury convicted Thomas Weston and Larry Boone of conspiring to distribute and possess with intent to distribute cocaine and cocaine base ("crack"). Both have appealed alleging numerous trial and sentencing errors. The government has also filed a cross-appeal challenging Weston's sentence based upon the district court's calculation of Weston's Base Offense Level.

2

For the reasons that follow, we will affirm the convictions of both defendants on all counts of the indictment, and we will also affirm Boone's sentence. However, for reasons set forth below, we will vacate Weston's sentence and remand for re-sentencing consistent with this opinion.

I. FACTS

Thomas Weston manufactured crack cocaine and enlisted numerous persons to distribute large quantities of crack and powder cocaine in Asbury Park, New Jersey between 1995 and 1998. The evidence at trial established that Weston purchased 3 to 5 kilograms of cocaine powder from a wholesale distributer in New York City. He converted cocaine powder into crack cocaine, delivered cocaine to a coterie of street level dealers for distribution in Asbury Park, and personally "cooked" at least 200 grams of cocaine powder into crack cocaine.

Weston solicited Stewart Mills, a hot dog vendor in Asbury Park, to sell crack cocaine for him. However, Mills was a reformed drug addict who was strongly opposed to drug-dealing. Unbeknownst to Weston, Mills told local law enforcement officials about Weston's drug activities and agreed to broker controlled drug deals between Weston and undercover agents posing as drug buyers.

Weston told Mills that crack should be sold at $900 an ounce, and that Mills would have to sell a minimum of 4 ounces. Weston also gave Mills code words and numbers that Mills was to use when communicating with Weston about drug transactions. Weston eventually agreed to sell four ounces of crack to a buyer whom Mills introduced as a drug user named "Malik." Malik was actually Gregory Hilton, an undercover agent of the Drug Enforcement Agency. Mills and Weston agreed that the sale would occur on July 11, 1997, in Howell, New Jersey, at a flea market known as the "Collingswood Auction."

Thereafter, Mills paged Weston from a public telephone as instructed by the DEA agents. He entered the number "3600" which represented the price (i.e. $3,600) that Agent Hilton was willing to pay for 4 ounces of crack as Weston had requested. Weston called Mills back and arranged a

3

meeting at Weston's home in Asbury Park, and Mills and Weston then met to finalize the arrangements.

Weston next contacted Curtis Farris (a/k/a "C-Allah") and offered him $500 to deliver the drugs to the buyer at the Collingswood Auction. Farris agreed and told Weston that he would have someone else make the actual delivery. Farris selected Larry Boone (a/k/a "God Supreme"). Boone had sold cocaine for Farris before, and Farris knew that Boone and Mills were friendly.

Farris offered Boone $100 and an eighth of an ounce of cocaine to deliver the package of cocaine to Collingswood Auction and collect the sales price. Boone agreed. Meanwhile, Weston partially reneged on his agreement with Mills to provide four ounces of crack cocaine, and unilaterally substituted 111 grams (approximately four ounces) of cocaine powder for delivery to Farris. On the afternoon of July 11, 1997, Farris drove Boone to the Collingswood Auction in a black Jeep. En route, Farris gave Boone a brown paper bag. That bag contained a smaller plastic bag containing 111 grams of powder cocaine that Weston had supplied.

Law enforcement officials who had set up surveillance at the Collingswood Auction saw Weston and two other people arrive 2:45 p.m. Farris and Boone arrived about ten minutes later. Boone approached Mills and said he was "there to do the deal." Mills introduced Farris and Boone to Agent Hilton, posing as "Malik." Hilton accompanied Boone to Farris' car as directed. Once inside the car, Boone took a clear plastic bag from his jacket. The bag contained the distinctive white cocaine powder. Agent Hilton never saw the brown paper bag.

Although Weston had set a price of $3,600, unbeknownst to Farris, Boone demanded $3,700 from Agent Hilton. Hilton briefly complained about the increase but ultimately paid it as he did not want to compromise the investigation by walking away from the transaction. Hilton agreed and Boone handed him the plastic bag of cocaine which Agent Hilton opened and examined in Boone's presence inside the Jeep. After inspecting the cocaine in front of Boone, Hilton produced $3,700 in cash which he counted in Boone's

4

presence and handed to Boone so that Boone could recount it. After Hilton left the Jeep, Boone surreptitiously skimmed $100 from the $3,700 payment, and drove off followed by Weston who had driven another car to the flea market to observe the transaction.[1]

About a week later, Boone came to Mills' home. Boone announced that he "was back rolling," which meant that he was selling cocaine again. He informed Mills that he (Boone) had a "connection" and could get Mills all the "weight" (large quantities of cocaine) that Mills wanted. During that meeting, Boone gave Mills his "business card."

Several weeks later, again acting at the request of DEA, Mills brokered another sale of four ounces of cocaine from Weston to Agent Hilton posing as "Malik." During a surreptitiously recorded conversation on July 22, 1997, Mills told Weston that Malik wanted to buy four ounces of crack for $3,600 during the following week. Weston again gave Farris powder cocaine, rather than crack. However, Farris used Herbert Jones to make the delivery to Hilton because he could not find Boone. Jones made the delivery on August 1, 1997. This time the transfer occurred in a restaurant that Mills owned.

Mills again met Weston on October 4, 1997. The meeting occurred inside a bar, and during the meeting Mills (who was equipped with a hidden recorder) asked Weston why he had delivered powder cocaine on July 11 and August 1 rather than the crack that Malik requested. Weston initially claimed that he no longer "cooked up crack." However, Weston then directed Mills out of the bar so they could speak without being overheard. Using slang terms for manufacturing crack ("cooking," "laying out," "bringing back"), Weston told Mills that he (Weston) would convert the four ounces of cocaine that he most recently sold to Malik into four and one-half ounces of crack. Weston also told Mills that he could provide Mills with additional crack cocaine if he wanted it. Later, Weston told Mills to pick up

_____

1. Surveillance officers captured the entire transaction on videotape, and Hilton wore a hidden audio transmitter that allowed his conversation to be recorded by the agents conducting surveillance.

some powder cocaine, and bring it to Weston's home so that Weston could "cook it up."

## II. DISTRICT COURT PROCEEDINGS

Weston, Boone and Jones were arrested by warrant and complaint on June 3, 1998. Farris was arrested on September 11, 1998. On October 27, 1998, a federal grand jury issued a superseding indictment charging Weston, Boone, Farris and Jones with conspiring to distribute, and possessing with intent to distribute, more than 5 grams of cocaine base (crack cocaine) and more than 200 grams of cocaine, contrary to 21 U.S.C. S 841(a)(1), in violation of 21 U.S.C. S 846. The government also filed an enhanced penalty information against Weston, pursuant to 21 U.S.C. SS 841(b)(1)(B) and 851(a)(1). The requested enhancement was based upon Weston's 1992 sentence of four years incarceration in Maryland for possession of 39 grams of crack cocaine with intent to distribute.

Farris entered into a plea agreement whereby he agreed to cooperate with the government and plead guilty to the superseding indictment. Jones also pleaded guilty. Boone and Weston proceeded to trial where the jury convicted them of the charged conspiracy.

Prior to sentencing, the Probation Office calculated Weston's Adjusted and Total Offense Level at 40. 2 In light of Weston's five criminal history points, and Criminal History Category of III, Weston's Guidelines Range was 360 months to life imprisonment. Following three days of sentencing hearings, the district court reduced the Total Offense Level from 40 to 32.3 The court refused to consider any of the crack cocaine that Weston cooked as "relevant conduct"

_____

2. The Probation Office used the 1998 Sentencing Guidelines Manual for Weston and Boone.

3. It is not clear from the briefs or the transcript of the proceedings why
the district court reduced the Total Offense Level to 32. The only relevance that it may have for our purposes is the Apprendi claim that we discuss below. However, as we discuss below, inasmuch as Weston is exposed to a life sentence because of a prior drug felony conviction, Apprendi does not apply.

under the Guidelines. This reduced the Guideline Range calculated by the pre-sentence report by more than half. The district court also reduced Weston's Criminal History Category to II, resulting in a Guidelines Range of 135 to 168 months. The district court then imposed a sentence of 168 months and a term of supervised release of 8 years.

Because Boone had been convicted of two previous drug-trafficking felonies in New Jersey state courts, as well as aggravated assault with a deadly weapon, the district court found that Boone was a "career offender" under the Sentencing Guidelines. The court assigned Boone a Base Offense Level of 32, and a Criminal History Category of VI. The court declined Boone's request for a three level downward adjustment for "acceptance of responsibility" pursuant to U.S.S.G. S 3E1.1, but the district court agreed that the resulting Guidelines Range of 210 to 262 months was too high. Therefore, the court granted Boone a three level downward departure, and imposed a custodial sentence of 151 months -- the bottom of the resulting sentencing range -- followed by a four-year term of supervised release.

Weston and Boone have filed appeals, at Nos. 99-5695 and 99-5439 respectively. In Weston's case, the government has filed a cross-appeal (No. 99-5894), based upon the district court's failure to attribute any crack cocaine to Weston in calculating his applicable Offense Level. We will separately discuss each defendant's appeal and the government's cross-appeal.

III. WESTON'S APPEAL

Weston's counsel has raised three claims of trial error. In addition, we have permitted Weston to file a pro se brief, in which he has raised three claims of sentencing error. Each assignment of error is discussed separately.

1. The District Court Erred by Allowing Testimony Regarding Threats Against a Government Witness.

In his counseled brief, Weston argues that the district court improperly allowed the government to cross-examine

two defense witnesses regarding Weston's efforts to coerce Farris into providing false exculpatory testimony for Weston.

After Weston was indicted, he tried to get Farris to sign an affidavit in which Farris was to swear that he did not know Weston. When Farris returned to prison following his guilty plea, he found a letter in his cell.[4] The letter threatened harm to Farris and his family if Farris testified against Weston, and it instructed Farris to recopy a portion of the letter and sign it in his own handwriting. The portion of the letter that was to be recopied stated that Weston had not committed the crimes he was charged with. Farris believed that the letter came from Weston. Farris did copy a portion of the letter as requested, but he added a sentence in which he asked the reader to notify law enforcement if Farris was the victim of foul play. Farris then threw away the original letter.

Farris later spoke to Robert Perry, an inmate who worked in the prison library and was helping Weston prepare for trial. Perry told Farris that he should hope for a long prison sentence, because otherwise "somebody is going to kill you." Farris responded by telling Perry that he would withdraw his guilty plea and refuse to testify against Weston. Farris hoped that Perry would relay that message to Weston.

Shortly thereafter, Farris was summoned to the prison library where he encountered Weston, Boone and Perry. Weston had Farris' letter and directed Farris to rewrite the letter omitting the reference to foul play. About one week later, Farris was again summoned to the prison library where Boone demanded that Farris write a similar letter

_____

4. According to the government, after Farris received the letter he asked another inmate named Gavin if he had written the letter. Gavin denied having written the letter but warned Farris that he had better not cooperate with the government because Farris' life and Farris' family's lives will be in danger. Government's Br. at 15 n.5. Presumably, Gavin is the same person Weston calls Garrin. According to Weston, Garrin is the only person who Farris actually identified as threatening him, but who the government never directly associated with Weston. Weston's Counseled Br. at 7.

8

exonerating him (Boone). Farris was transferred to another prison after telling law enforcement authorities about the threats. According to the government, Farris was terrified by these threats, and did not want to testify.

At trial, Weston denied ever threatening Farris, or ever seeing the letter that purported to exonerate Weston. Weston also testified that when he saw Farris in prison, Farris was surprised that Weston had been charged. According to Weston, Farris had suggested that Jones had implicated Weston, and Farris volunteered to exonerate Weston.

To further contradict Farris' testimony about Weston's intimidation, Weston presented several inmates who had been incarcerated with Weston and/or Farris. Johnny Davenport testified on direct examination that at the time of trial he had been an inmate in the same prison as Weston. He had known Weston for 18 years and Farris for 25 years. Davenport claimed that Farris admitted to him that the government wanted Farris to "lie on[Weston]." Davenport further testified that Farris told him that Weston was not involved in the drug conspiracy.

On cross-examination, Davenport testified, without objection, that he was six feet tall, and weighed about 225 pounds. When the prosecutor asked Davenport whether he made use of this time in jail by "keeping in good shape," Weston's counsel objected to "personal observations of the prosecutor." The objection was overruled. The prosecutor then inquired, without objection, whether Davenport lifted weights in jail. Davenport claimed that he did not. Then, again without objection, the prosecutor elicited testimony that Davenport had been convicted of drug-trafficking offenses and assault.

Weston also called Nard Henderson as a defense witness. Henderson testified on direct examination that he spoke to Farris while the two were in a holding cell at the Federal Courthouse in Trenton, New Jersey. According to Henderson, Farris told him Weston "had nothing to do with it." Henderson also claimed that Farris "was going to write a letter, clearing [Weston]." On cross-examination, Henderson testified without objection that he was six feet,

9

two and one-half inches tall, weighed 280 pounds, that he had an extensive criminal record that included drug-trafficking and resisting arrest, and that he was a"career offender."

Weston argues that the cross-examination of these witnesses was an improper attempt to "convey an image in the minds of the jurors that Farris was continually living under the threat of violent physical harm rendered by Weston's prison henchmen." Weston's Counseled Br. at 6-7. In Weston's view, "the harm visited upon [him], despite the incriminat[ing] evidence adduced below, mandates reversal by the Honorable Court." Id. at 7.

At the outset, we note that Weston's only objection to this line of cross-examination was that it exceeded the scope of direct, and that the questions were based upon improper observations by the prosecutor. Consequently, our scope of review as to these issues is whether the district court committed plain error in allowing the testimony. United States v. Saada, 212 F.3d 210, 224 (3d Cir. 2000). "[W]e may reverse only if we find error . . . so serious as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." United States v. Turcks, 41 F.3d 893, 897 (3d Cir. 1994)(citation omitted).

> A plain error is clear or obvious. In most cases, an error will be deemed to have affected substantial rights where it is prejudicial. Prejudicial error, affecting substantial rights, must have affected the outcome of the District Court proceedings. The inquiry concerning prejudice on plain error review is similar to our inquiry into harmless error with the important difference that the defendant, rather than the government, bears the burden of persuasion in a plain error analysis.

Id. at 898 (citation and internal quotations omitted). Here Weston never even attempts to show how the disputed testimony constitutes plain error. He merely claims that he was harmed by the "improper" cross-examination. We do not believe this testimony amounts to plain error, and he has not met his burden of showing that it was plain error.5

_____

5. We do not think the court erred in allowing this inquiry. However, even if we assume that the district court did err, the error clearly did not
affect the outcome of the trial because Farris, Perry, and Gavin (or "Garrin") also testified about Weston's threats.

10

2. The District Court Erred by Allowing
        the Government to Cross-Examine Witnesses About
        Weston's Prior Drug-Trafficking Activities.

Weston's counsel also argues that the district court
improperly allowed the government to cross-examine two
witnesses about Weston's prior, uncharged drug-trafficking.
Weston called Rayfield James as a character witness, and
asked him about Weston's reputation in the community for
truthfulness and honesty. James replied that Weston is
"straightforward," and "a man of his word." On cross-
examination, James testified, without objection, that "with
me, . . . [Weston had] a reputation for being law-abiding,"
and truthful. James also testified on cross-examination
that he was unaware that Weston had previously been
convicted of dealing crack cocaine, but that, even if he had
been aware, it would not have changed his opinion of
Weston's character.

However, Weston objected when the government asked
James if he was aware that the nightclub Weston owned in
Asbury Park had been the subject of a search warrant
executed by narcotics agents. The objection was overruled
and the district court immediately instructed the jury that
the question was permissible "not for the truth of any such
assertion but rather as it may affect the opinion of the
witness." James then testified that he was not aware of any
search warrant and that even if he had been, it would not
have affected his opinion of Weston.

Weston's counsel argues that allowing questions about
Weston's prior conviction and the search of his night club
amounted to "fatal error." According to counsel, "[t]he
inescapable conclusion is that the government knew of
other narcotic activity on [Weston's] part that was not part
of [his] trial" and "a juror could only be left with the
thought that Weston was a continuing target for narcotics
agents." Weston's Counseled Br. at 8. We disagree.6

_____

6. We review for plain error those claims that were not preserved in the
district court, United States v. Saada, 212 F.3d 210, 224 (3d Cir. 2000),
and for abuse of discretion for those claims that were preserved. United
States v. Davis, 183 F.3d 231, 256 (3d Cir. 1999).

11

The Federal Rules of Evidence provide that:

> In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.

Fed. R. Evid. 405(a)(italics added). Therefore, the government could inquire about James's awareness of Weston's prior conviction and the execution of the search warrant at Weston's night club once Weston put his character in issue. See United States v. Scholl , 166 F.3d 964, 974-75 (9th Cir. 1999)(approving cross-examination of opinion character witness by reference to defendant's specific acts of misconduct). The district court has broad discretion regarding the cross-examination of character witnesses, and the court did not abuse that discretion in allowing the government to challenge the character testimony that Weston offered. United States v. Furst, 886 F.2d 558, 578 (3d Cir. 1989).

Furthermore, inasmuch as counsel did not object to inquiry into Weston's prior drug-trafficking conviction during James' cross-examination, Weston again has the burden of establishing plain error.

The testimony regarding the search of Weston's night club did not amount to plain error. For one thing, Mills testified, without objection, that he had purchased drugs there. Accordingly, we fail to see how inquiring into James' knowledge of a search of that night club could have prejudiced Weston; especially given the district court's prompt limiting instruction. See United States v. Curtis, 644 F.2d 263, 269 (3d Cir. 1981)(no reversible error for improper cross-examination of a reputation witness which elicited only information that had already been introduced into evidence).

Similarly, Duval Moore testified on direct examination that he and Farris were lifelong friends, and cell mates in jail. Moore told the jury that Farris told him that Farris had a deal that included falsely implicating Weston in the charged drug offenses. On cross-examination, Moore continued to claim that Farris told him that the FBI

12

instructed Farris to lie about Weston. Moore also claimed that Farris gave him a letter in which Farris stated that he wanted to withdraw his guilty plea because he knew he would have to lie for the government. However, according to Moore, law enforcement officials refused to allow Farris to withdraw his plea.

The government attacked Moore's credibility by eliciting (without objection) that Moore had several convictions for cocaine trafficking and violent crimes. Moore refused to identify his suppliers during that line of questioning, and the government responded by asking: "isn't it a fact that you distributed Thomas Weston's cocaine and you're covering for him here?" Moore denied that assertion and Weston's counsel stated he objected "unless the prosecutor has some proof of that." At a sidebar, the government then proffered that Farris had informed investigators that he once delivered a package of cocaine from Weston to Moore for subsequent distribution by Moore. Weston's counsel responded with a motion for a mistrial, "just for the record," which the court denied.

Weston now argues that testimony was "highly inflammatory, . . . meant to prejudice, and [constitutes] reversible error." However, at trial Weston did not object to the inquiry because of its inflammatory or prejudicial nature. Rather, counsel argued that the question was not permissible unless the government had proof of the assertion. Accordingly, we once again review for plain error. Given the context of the cross-examination, we conclude that the district court did not commit any error in allowing the inquiry -- let alone, plain error. Evidence that Moore and Weston had been drug dealing partners was relevant to Moore's possible bias in favor of Weston. See United States v. Abel, 469 U.S. 45, 52 (1984)(evidence regarding joint membership of witness and defendant in criminal organization was properly admitted to establish possible bias of witness in favor of defendant). In addition, the jury was properly instructed that answers, not questions, constitute evidence, and Moore denied selling drugs for Weston.7

_____

7. In explaining why this evidence did not violate the strictures of Rule 404(b), we again emphasize the danger inherent in this kind of evidence.

13

Moreover, there was significant evidence of Weston's involvement in the drug trade. Mills testified that he saw Weston distribute drugs, that he purchased drugs from Weston, and that Weston solicited him to sell drugs. Farris testified that he purchased drugs with Weston. Weston admitted that he had previously manufactured crack cocaine, and Weston was captured on audiotape discussing the charged conspiracy with Mills. Thus, the district court did not err in allowing the limited inquiry into whether Moore once sold drugs for Weston to establish the relationship between the two. See United States v. Godinez, 114 F.3d 583, 588 (6th Cir. 1997)(no plain error for improper question on cross-examination of defense witness about whether defendant was involved in drug-dealing, where cooperating co-conspirators had previously testified extensively that defendant was the leader of a drug-trafficking organization).

3. The District Court Erred by Refusing
   to Strike All References to Crack Cocaine.

At the close of the government's case, Weston moved to strike "any illusions to crack cocaine" from the jury's consideration. He argued that the government's evidence proved that Weston actually sold Agent Hilton cocaine powder, not crack cocaine. However, the district court denied Weston's motion. Here, Weston's counsel argues that "injecting the specter of crack evokes the ire of any jury," and is "so inflammatory that the mere unsubstantiated allegation of involvement may be enough to convict." Weston's Counseled Br. at 10. He therefore asserts that the district court committed reversible error in denying his motion.

As recited earlier, the superseding indictment charged that Weston, Farris, Boone and Jones conspired to distribute and to possess with intent to distribute more

_____

See United States v. Sampson, 980 F.2d 883, 886 (3d Cir. 1992) ("Although the government will hardly admit it, the reasons proffered to admit prior bad act evidence . . . is often mixed between an urge to show some other consequential fact as well as to impugn the defendant's character.").

14

than 5 grams of crack cocaine and more than 200 grams of cocaine. Although the substance that Weston actually delivered was cocaine powder, more than sufficient evidence was introduced at trial to support the conviction for conspiring to manufacture and deliver crack cocaine. The government produced testimony that Weston had, on two occasions, agreed to supply crack cocaine to agent Hilton, and Weston offered to personally convert the powder to crack when Mills (the go-between) reminded Weston that Hilton wanted crack.

At trial, Weston denied furnishing the cocaine that was delivered to Hilton. However, the evidence certainly supported the jury's conclusion that Weston was responsible for that delivery. Weston's argument is really bottomed upon an implicit assertion that he cannot be convicted of conspiring to distribute crack without evidence that he actually delivered that substance as opposed to powder cocaine. However, one can certainly conspire to deliver and distribute crack without the actual distribution or delivery if the charge has otherwise been proven beyond a reasonable doubt. See United States v. DeSimone, 119 F.3d 217, 223 (2d Cir. 1997). Consequently, the district court properly refused counsel's motion to strike "any illusions to crack cocaine" from the jury's consideration.8

_____

8. The legal basis for counsel's motion is not clear. In the district court,
he relied upon Fed. R. Crim. P. 29. However, we do not believe that rule gives the district court the authority to strike evidence from the jury's consideration. Rather, it authorizes the district court to "order the entry
of judgment of acquittal of one or more of the offenses charged in the indictment . . . after the evidence on either side is closed if the evidence
is insufficient to sustain a conviction for such offense." Fed. R. Crim. P.
29. On appeal, counsel does not cite to any specific authority. Rather, he characterizes his motion as one "to strike crack cocaine from the indictment." Weston's Counseled Br. at 10. However, Weston never mentioned the indictment in his motion to strike in the district court and he never mentioned Fed. R. Crim. P. 7(d), which governs requests to strike allegations from an indictment. In any event, we have ignored the procedural intricacies and reached the merits of the argument.

15

4. The PSR Erroneously Calculated the Amount of
     Drugs Attributable to Weston.

In his pro se brief challenging his sentence, Weston
argues that the district court erred at sentencing by
attributing 5 kilograms of cocaine powder to him that he
purchased in New York City.9 In Weston's view, only the
220 grams of cocaine powder that he caused to be delivered
to Agent Hilton during the two controlled buys identified in
the indictment can be attributed to him under the
Sentencing Guidelines.

However, a sentence in a criminal conspiracy is based
upon all relevant conduct and not merely offense conduct.
See United States v. Rivera–Maldonado, 194 F.3d 224, 228
(7th Cir.) (Since defendant was convicted of conspiring to
distribute controlled substances, she is responsible for all
"drugs [she] personally handled or anticipated handling,
and, under the relevant conduct rubric, for drugs involved
in additional acts that were reasonably foreseeable by
[her] and were committed in furtherance of the
conspiracy.")(citation omitted). The evidence here easily
established that Weston's relevant conduct included the
purchase and sale of approximately 5 kilograms of cocaine
powder.

Weston and Farris first met in the autumn of 1995 inside
Farris' telephone pager store in Asbury Park. Weston had
four pagers set to a single telephone number which he used
in dispatching his confederates to make cocaine sales. After
Weston told Farris that he was unhappy with his cocaine
suppliers, Farris drove Weston to New York City to meet a
man referred to as "Poppy", a Dominican from whom Farris
had been buying cocaine in lots of 200 to 700 grams. 10

Farris introduced Weston to Poppy as a "steady", and
described Weston as a high volume cocaine buyer. Weston

_____

9. "When . . . construction of the Sentencing Guidelines is required on
appeal, the standard of review is plenary." United States v. Greene, 212
F.3d 758, 760 (3d Cir. 2000). Review of the district court's findings of
facts with regard to the sentence is clear error. United States v. Yeaman,
194 F.3d 442, 456 (3d Cir. 1999).

10. Farris diluted the cocaine and then sold the diluted product.

and Farris each gave Poppy $4,000 to purchase a total of 400 grams of cocaine. Thereafter, on five or six occasions, Weston gave Farris cash in the average amount of $6,000 to purchase additional cocaine from Poppy. Farris charged Weston 10 grams of cocaine (worth about $300) in return for purchasing $6,000 to $7,000 of cocaine from Poppy. On three or four other occasions, Weston bought cocaine from Poppy for Farris in amounts of up to $8,000, and charged Farris the same ten gram fee for that "service." On six or seven other occasions, Weston went to Poppy and made unspecified purchases of his own.

In early 1996, Weston and Farris went together to New York City, where each purchased between $6,000 and $8,000 of cocaine from Poppy. The evidence established that Weston and Poppy appeared to be well acquainted with each other. Weston last used Farris to purchase cocaine from Poppy in late 1997 or early 1998. Farris' testimony established that Weston's bulk cocaine purchases from Poppy to Weston and/or Weston and Farris amounted to between 4.8 and 5.7 kilograms of cocaine. The Sentencing Guidelines provide that "[t]ypes and quantities of drugs not specified in the count of conviction may be considered in determining the offense level. See S 1B1.3(a)(2)(Relevant Conduct)." U.S.S.G. S 2D1.1, Application Note 12.

Relevant Conduct for a drug trafficking conviction includes not only all controlled substances involved"during the commission of the offense of conviction," but also those substances involved as "part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. S 1B1.1(a)(2). Consequently, all of Weston's drug-trafficking that was part of the same course of conduct or common scheme must be included in the drug quantity, regardless of whether a particular transaction resulted in a conviction. See U.S.S.G. S 1B1.3, Application Note 3 (application of S 1B1.3(a)(2) "does not require the defendant, in fact, to have been convicted of multiple counts.").

Weston's multiple drug-trafficking offenses, including the offense of conviction, and his purchases from Poppy, were part of a "common scheme or plan," because they were "substantially connected to each other by at least one common factor, such as . . . common accomplices, . . . [or

17

a] common purpose." U.S.S.G. S 1B1.3, Application Note 9(A). Weston and Farris were clearly accomplices in the offense of conviction and in their joint purchases of cocaine powder from Poppy. Farris introduced Weston to Poppy, identified Weston as a reliable bulk purchaser of cocaine, purchased cocaine from Poppy for Weston, and gave Weston money to purchase cocaine from Poppy. Farris also arranged for Boone and Jones to deliver Weston's cocaine in the charged conspiracy. Therefore, the district court properly held Weston accountable for all the cocaine that he purchased from Poppy; either alone or jointly with Farris.

The purchases from Poppy and the offense of conviction also "qualifi[ed] as part of the same course of conduct [because] they [were] sufficiently related or connected to each other as to warrant the conclusion that they were part of [an] . . . ongoing series of offenses." U.S.S.G. S 1B1.3, Application Note 9(B). The conduct all occurred within the small geographic area in or near Asbury Park, involved cocaine that Weston sold through intermediaries, and it involved the same co-conspirators, i.e., Weston and Farris.

Accordingly, we find no merit in Weston's claim that the 5 kilograms of cocaine purchased in New York should not be attributed to him under the Sentencing Guidelines.

5. The District Court Erred by Crediting Farris'
        Testimony on the Volume of Drugs Weston
        Distributed.

In his pro se brief, Weston relies upon United States v. Miele, 989 F.2d 659 (3d Cir. 1993), in arguing that the district court committed clear error by crediting Farris' testimony regarding the volume of cocaine that he and Weston purchased from Poppy. Weston claims that Farris' testimony was internally inconsistent.

In Miele, the district court's estimate of drug quantity rested upon the unsworn hearsay statement of an informant. That informant later contradicted that estimate in sworn testimony he gave during the trial of Miele's co-defendants. We found that the "vast disparity between [the informant's] estimate in the PSI and the significantly lower

18

estimates he provided at the co-defendants' trial cast [ ] doubt on the reliability of the PSI's estimate." Id. at 664. Since the district court never explained why it accepted the informant's higher estimate in calculating the drug quantity, we remanded for resentencing. Id.

Here, however, the district court based the volume of cocaine on Farris' sworn trial testimony, and the court concluded that the testimony was reliable. The testimony remained unshaken after vigorous cross-examination. Moreover, the "vast disparity" in estimates of drug quantity that we found so troubling in Miele is absent here. Farris' testimony was neither speculative nor contradictory. Weston argues that Farris' testimony was contradictory because Farris first testified on direct that he and Weston first went to New York to buy cocaine from Poppy in 1995, but then, on cross-examination, testified that the first trip was in 1996. Although Farris did initially testify that the first trip was in 1995, he immediately corrected himself and explained that it was in 1996. Moreover, even if he had not done so, the resulting discrepancy would not have been analogous to the discrepancies in Miele. Slight memory lapses hardly compel a sentencing court to completely reject testimony about drug quantity. This is particularly true where, as here, it was immediately corrected, and involves an issue that is not at all relevant to the substance of the testimony about drug quantity. See United States v. Huddleston, 194 F.3d 214, 224 (1st Cir. 1999)(rejecting argument that district court, in calculating the drug amount, should not have relied on testimony of an informant whose "testimony regarding dates and times was fuzzy," because "such credibility calls are grist for the trial court's mill."). Given Farris' familiarity with drug transactions, his estimate of volume was appropriately considered by the district court. It is "not unreasonable . . . to believe that the testimony of a man experienced in drug deals was sufficient to establish an appropriate drug quantity." Id.

Weston also alleges that Farris' testimony should not be credited because of an inconsistency regarding the wholesale price of cocaine. Farris said that he paid $20 a gram for cocaine that he purchased from Poppy in New

York in bulk. He also said that he and Weston paid Poppy $4,000 each for "close to half a key [kilogram]." Finally, Farris testified that he and Weston would charge each other $300 to pick up cocaine from Poppy, and ten grams of cocaine (i.e., $30 a gram) were accepted in payment.

However, as the government points out, Farris' accounts are easily reconciled. At $20 a gram when bought in bulk, 400 grams, costing $8,000, ($4,000 from Weston and $4,000 from Farris) is relatively "close to half a key," i.e., 500 grams. Farris testimony that smaller quantities (i.e. 10 grams) cost more (i.e. $30 a gram) than bulk purchases simply reflects the "economies of scale" that apparently operated in this illegal market.

Finally, Weston complains that Farris' testimony should not be credited because Farris did not give a dollar amount for each of the quantities of cocaine that either he or Weston purchased from Poppy. Therefore, argues Weston, the district court's estimate of the total volume of drugs was clearly erroneous. We disagree. Farris recited particular dollar amounts for several of the purchases, estimated the average amount of money spent during other transactions, and estimated the total number of transactions. This is sufficient to support the district court's estimate of the total amount of cocaine that Weston and Farris bought from Poppy. See United States v. Grandados, 202 F.3d 1025, 1029 (8th Cir. 2000)(not clear error for district court to estimate unknown quantities of drugs involved in certain transactions by reference to known quantities involved in other, similar transactions).

6. The District Court Erred by Enhancing Weston's
        Sentence for Obstruction of Justice.

Section 3C1.1 of the Sentencing Guidelines provides for a two level enhancement if a defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice." Examples of obstruction include: "threatening, intimidating, or otherwise unlawfully influencing . . . a witness, or attempting to do so;" "suborning, or attempting to suborn perjury"; and "other conduct prohibited by the obstruction of justice provisions

under Title 18, United States Code." U.S.S.G.S 3C1.1, Application Note 4(a).

In the Presentence Report, the Probation Office found that Weston obstructed justice and recommended a two level enhancement under U.S.S.G. S 3C1.l. This was based upon the letter that Weston attempted to coerce Farris into signing. PSR P 38. Weston objected, claiming that Farris' account of the circumstances surrounding the purported letter were not credible. However, the district court observed Farris' testimony and concluded otherwise. The court concluded "this is one of the most clear and convincing episodes of obstruction of justice that I have seen." The court found that it even rose to a level that exceeded the degree of obstruction encompassed within the "heartland" of S 3C1. It would have been difficult to conclude otherwise.

In his pro se brief, Weston challenges Farris' credibility by pointing to Farris' cross-examination testimony about a gold cadillac Weston purportedly owned. However, Weston's ownership of a gold Cadillac has absolutely nothing to do with his conviction. The district concluded that Farris testified credibly about Weston's obstruction activity, and we afford that finding deference. United States v. Igbonwa, 120 F.3d 437, 440 (3d Cir. 1997). Given the credible testimony that Weston directly and indirectly attempted to coerce Farris into signing a copy of the aforementioned exculpatory letter, the district court did not err in concluding that a two level enchantment for obstruction of justice was warranted.

IV. THE GOVERNMENT'S CROSS-APPEAL
IN WESTON'S CASE

The government argues that the district court erred in reducing Weston's Offense Level and Guidelines Range by ignoring credible evidence that he manufactured and distributed at least 200 grams of crack cocaine. The government claims that Weston's Offense Level should be increased at least to the level applicable to the 200 grams of crack cocaine that Weston manufactured on a single occasion.

21

The government relies upon the crack that Weston personally manufactured from the powder he and Farris purchased from Poppy in New York City. Earlier, we noted that Weston and Farris bought cocaine powder in New York City from Poppy for distribution in Asbury Park. Weston told Farris that crack cocaine sold faster on the street than cocaine powder. Weston also told Farris that he (Weston) personally manufactured crack from cocaine powder and could produce 140 grams of crack from every 100 grams of cocaine powder used. After one of Farris' customers complained about some cocaine he had purchased from Farris, Farris went to Weston to ask if Weston could convert cocaine powder into crack. When Farris encountered Weston, Weston was in the middle of preparing a batch of crack. Farris testified that he saw "maybe a couple of hundred grams" of powder cocaine on a plate, and some baking soda. In Farris' presence, Weston placed the mixture of cocaine powder and baking soda into a pot of boiling water and held the pot over the stove. After the water boiled off, the hard, off-white crack cocaine remained as a residue in the pot. Farris was very familiar with the appearance of crack having ingested it in the past.

On another occasion, while Weston was selling Farris cocaine powder on the street, Weston dropped a clear plastic bag containing 7 to 10 grams of crack cocaine on the ground.

Weston also repeatedly solicited Mills to sell crack cocaine for him. He told Mills that Mills could multiply his daily income from hot dog sales (about $150 a day) by ten or twenty times if he sold crack cocaine for Weston. Weston said that a street-level dealer for his drug-trafficking organization could earn at least $1,500 and as much as $3,000 a day in commissions from the sales of crack cocaine.

Weston also told Mills that Weston could "lay out" or cook powder cocaine in order to transform it into"rock cocaine," i.e., crack. Weston said he could convert an ounce of powder cocaine into an ounce and a half of crack. On one occasion, Weston showed Mills some crack cocaine and told Mills, "this is the game you need to get into to make a lot more money."

22

Mills sold hot dogs from a pushcart in front of a night club called the "Mishypoo." The club was frequented by numerous crack dealers, including those working for Weston. The dealers would sell crack directly outside the night club, in plain view of Mills. When the crack dealers went inside the night club, they would occasionally ask Mills to come into the bar and tell them when Weston arrived so they could get their inventory from him. Mills testified that Weston drove to the club two to three times a week. When he arrived, he would summon the dealers to his car. After a few minutes they would leave with packages of crack cocaine to sell.

In addition, Mills later brokered the two aforementioned crack deals between Weston and Agent Hilton. During his direct testimony, Weston admitted to previously manufacturing crack, and being convicted for offenses involving crack in Maryland several years earlier. He testified that it was common to refer to the manufacture of crack using terms such as: "cook" cocaine,"lay it out," and "bring it back." He explained that the process requires boiling cocaine powder, baking soda and water together and that if a large amount of baking soda was used, the amount of crack produced would exceed the amount of cocaine powder used. That is consistent with Mills' and Farris' testimony about the crack Weston manufactured.

The PSR stated that the trial evidence established that Weston (personally or through Farris) obtained a minimum of 5 kilograms of powder cocaine from Poppy, the New York City supplier. PSR P 31. According to the PSR, a preponderance of evidence established that Weston converted most of the 5 kilograms of cocaine powder into crack. Id. The gram weight of that crack was at least equal to the gram weight of the powder cocaine. Id. Accordingly, the PSR recommended that Weston be held accountable for at least 1.5 kilograms of cocaine base. Id. The PSR thus applied a Base Offense level of 38 under U.S.S.G. S 2D1.1(c)(1).11 PSR PP 42–51.

_____

11. The Drug Quantity Table requires its highest Offense Level of 38 if the defendant is responsible for "1.5 KG or more of `cocaine base.' " U.S.S.G. S 2D1.1(c)(1).

23

Weston objected to that calculation, and claimed that he should only be held accountable for the 220 grams of powder cocaine that was delivered to Agent Hilton. At the first of three sentencing hearings, Farris testified that, based on his extensive experience as a seller of cocaine powder, he could accurately estimate the weight of a batch of cocaine powder from a visual inspection. After argument by the parties, the district court adopted the PSR's calculation that Weston was responsible for at least 1.5 kilograms of crack cocaine (and 5 kilograms of cocaine) and was subject to a Total and Adjusted Offense Level of 40. The hearing was then continued to another date to consider another issue.

At the second sentencing hearing, Weston challenged the trial testimony that he was an extensive crack dealer. However, the district court rejected Weston's challenge stating:

> I presided over the trial and also over the [first] sentencing hearing [at which Farris testified]. . . and I was able to make determinations as to credibility. .. . It seems to me that there's no reason to revisit my prior ruling contrary to the defendant's position [regarding the applicable drug type and amount]. Neither Mills nor Farris can be found incredible. Rather, they -- I found them to be quite credible as to the defendant's position himself that he was aware of and knew how to prepare crack cocaine . . . . My prior ruling will stand.

Even though Weston was properly held responsible for at least 1.5 kilograms of crack cocaine (and therefore subject to an Adjusted Offense Level of 40 and a Guidelines Range of 325 to 405 months), Weston challenged the Adjusted Offense Level and Guidelines Range by continuing his attack on Farris' credibility. However, the district court correctly pointed out that, even without any of the crack that Weston manufactured outside of Farris' presence, Farris saw Weston prepare approximately 200 grams of crack on one occasion alone.[12] Therefore, based only upon

_____

12. As recited earlier, Farris testified during the trial that he personally
observed Weston convert a batch of "maybe a couple of hundred grams" of cocaine powder into crack.

24

those 200 grams, Weston's base offense level would be 34, pursuant to U.S.S.G. S 2D1.1(c)(3), i.e.,"At least 150 G[rams] but less than 500 G[rams] of Cocaine Base."13 The district court then adjourned the sentencing hearing to the next day in order to consider additional documents that Weston had submitted.

At the third sentencing hearing, the district court repeated that it "remained convinced of [Farris'] credibility." It also noted that the evidence established that Farris saw Weston manufacturing "a fairly substantial quantity" of crack on one occasion. The court noted that the evidence showed that Weston was asked to manufacture crack cocaine on a number of occasions, and that Weston talked about crack to Farris and Mills. Nonetheless, the district court concluded that the evidence failed to establish the amount of crack cocaine attributable to Weston with sufficient precision. The court explained:

> [t]he danger is that although [Weston] may be a substantial crack dealer, we don't know how much crack he was actually providing, and we want to be careful not to go from a reasonable extrapolation into the possibility of conjecture, especially where the guidelines are so severe.

After reiterating that Farris testified truthfully about Weston's drug-trafficking and that the government had proven that Weston was a "substantial drug dealer," the district court decided that it would give Weston the"benefit of the doubt." Therefore, based on Farris' testimony about the volume of cocaine powder he and Weston purchased in New York City from Poppy, the court assigned between 3 to 5 kilograms of powder cocaine to Weston. That attribution rested on a finding supported "by clear and convincing evidence," and not merely by a preponderance of the evidence. It resulted in a base offense level of 30. U.S.S.G. S 2D1.1(c)(5). However, the district court continued to have concerns about the amount of crack cocaine involved. The court noted:

_____

13. The Guidelines Drug Quantity Table states that " `Cocaine base,' for purposes of this guideline, means `crack.' " U.S.S.G. S 2D1.1(c)(1), Note (D).

25

As far as cocaine base, we know that [Weston] was in possession of some crack cocaine. In the testimony of Farris we don't have a calculation of the precise amount. Was it, as the government speculates, about 200 grams? Was it less? You can certainly safely say that it was some amount. I think that's encompassed in level 30 as well as far as the defendant's activities as a crack cocaine dealer.

The government responded by reminding the district court that Farris watched Weston convert about 200 grams of cocaine powder into a like amount of crack on a single occasion. Therefore, argued the government, assuming a one-to-one ratio, Farris' estimate of 200 grams of crack was 50 grams (or 33%) more than the amount required for application of a Base Offense Level of 34 under U.S.S.G. S 2D1.1(c)(3), i.e., at least 150 grams but less than 500 grams of crack. The district court noted that the government's position was "persuasive and reasonable." Nevertheless, the court "prefer[red] to base [its] ruling upon the clear amount of powder cocaine which is here rather than the extrapolation of the crack cocaine." The court then opined: "as I say, I may well be wrong. I don't know. I may well be too lenient, but we'll see whether people feel I'm too lenient when the time comes. I don't intend to be lenient." Finally, the district court restated its position that it was basing its decision on drug quantities involved only on the basis of the cocaine powder and not crack cocaine:

The government makes a very strong argument that we should consider that there was 200 grams of cocaine base when he was cooking it, and therefore, it should be level 34. I say that is a reasonable position. I prefer to base my ruling on the powdered cocaine level here, but I do consider that, and I do consider [Weston's] crack cocaine activities –– including that testimony from Farris as to the substantial amounts of cocaine and the testimony of Mills concerning crack cocaine and [Weston's] own statements about the ability to crack –– to cook crack cocaine.

Not unexpectedly, the government argues that Weston's sentence must be vacated and the matter remanded so that the district court can hold Weston responsible for at least

26

the 200 grams of crack which Farris estimated he saw Weston manufacture.14 Therefore, the government argues that Weston's Base Offense Level should be 34. U.S.S.G. S 2D1.1(c)(3) ("At least 150 G but less than 500 G of Cocaine Base.").

We applaud the district court's caution and candor. However, under U.S.S.G. S 2D1.1, it is clear that the Base Offense Level for a drug-trafficking offense is a function of the quantity of the drugs involved in the offense, see United States v. Paulino, 996 F.2d 1541, 1543 (3d Cir. 1991), and the Guidelines Application Notes require that "the total quantity" of drugs involved in the count of conviction and all relevant conduct "shall be aggregated to determine the scale of the offense." U.S.S.G. S 2D1.1, Application Note 12 (emphasis added). The Application Notes further requires that "[w]here there are multiple transactions or multiple drug types, the quantities of drugs are to be added" using the drug equivalency tables. Id. Application Notes 6 and 10 ("In each case, convert each of the drugs to its marijuana equivalent, add the quantities, and look up the total in the Drug Quantity Table to obtain the combined offense level."). Similarly, the Guidelines Commentary provides that where "there is no drug seizure or the amount seized does not reflect the scale of the offense, the sentencing judge shall approximate the quantity of the controlled substance." U.S.S.G. S 2D1.1, Application Note 12 (emphasis added). Consequently, the district court must "determine the amount and kind of controlled substance for which[the] defendant should be held accountable -- and then .. . impose a sentence that varies depending on the amount and kind." Edwards v. United States, 523 U.S. 511, 513-14 (1998). We agree with the district court's concern that "recognition of the need to estimate . . . is not a license to calculate drug amounts by guesswork." United States v. Paulino, 996 F.2d at 1545. "Instead, the sentencing court must carefully scrutinize the government's proof to ensure

_____

14. By focusing on the crack cocaine Farris saw Weston manufacture on one occasion, we assume that the government has conceded that the evidence concerning Weston's manufacturing and/or distribution of any other crack cocaine is too imprecise to enable the sentencing court to properly calculate drug amounts, other than by sheer speculation.

that its estimates are supported by a preponderance of the evidence." Id.

However, the district court's drug quantity calculation here cannot stand. The district court never doubted Farris' credibility. Evidence at the last sentencing hearing caused the district court to expressly note that "one time [Farris] saw [Weston] cooking up a quantity of which was not measured but which he saw and looked like a fairly substantial quantity." Yet, the district court was concerned because Farris, though credible, was unable to state"the precise amount" of crack that he saw Weston manufacture on that one occasion.

As noted above, Farris' trial testimony established that he saw Weston preparing crack cocaine from "maybe a couple of hundred grams" of powder cocaine and some baking soda. Weston placed the mixture of cocaine powder and baking soda into a pot of boiling water and held the pot over a stove. There is no doubt that Farris was sufficiently familiar with crack to be able to properly identify the residue that Weston produced from the "couple hundred grams" of powder on that one occasion. Moreover, Farris testified at the first sentencing hearing that his experience as a cocaine dealer allowed him to accurately estimate the weight of a batch of cocaine powder based only upon a visual inspection.

The government relies upon Farris' estimate of a couple hundred grams of powder on this one occasion, and the credible testimony that he could accurately estimate the weight of a batch of cocaine powder. Weston stated that he could produce at least an equivalent amount of crack from a like amount of powder. Thus, argues the government, Farris' testimony is sufficient to establish that Weston manufactured at least 200 grams of crack.

The district court explained its reluctance to factor those 200 grams of crack into Weston's sentence as follows: "In the testimony of Farris we don't have a calculation of the precise amount. Was it, as the government speculates, about 200 grams? Was it less?" Yet, the district court was convinced that Weston "was in possession of some crack cocaine," and appeared to be convinced that Weston "may

28

be a substantial crack dealer." Finding itself in a quandary, the district court apparently sought middle ground by finding that Weston was responsible for the powder cocaine and for "some amount" of crack, but found that the crack was "encompassed in level 30 as well as far as the defendant's activities as a crack cocaine dealer."

However, that conclusion was erroneous. Since the district court found that Weston was responsible for"some amount" of crack cocaine as well as powder, it was required to convert each controlled substance into a volume of marijuana, pursuant to the Guidelines' "Drug Equivalency Tables," and then select the Offense Level that applied to the aggregated quantity of marijuana. U.S.S.G. S 2D1.1, Application Notes 6 and 10; see United States v. Brown, 36 F.3d 655, 663 (7th Cir. 1994). The district court was therefore required to consider all of the controlled substances, of whatever type, that Weston was responsible for. Its failure to aggregate the drug types and quantities requires us to vacate Weston's sentence and remand for resentencing.

The district court's conclusion that the crack was encompassed in the Base Offense Level of 30 is erroneous because it is tantamount to holding that Weston was not responsible for any crack whatsoever. A Base Offense Level of 30 would be proper if the district court had found that Weston was responsible only for 3 to 5 kilograms of cocaine powder. U.S.S.G. S 2D1.1(c)(5)("At least 3.5 KG but less than 5 KG of Cocaine."). However, once the district found Weston responsible for any amount of crack cocaine, it had to apply a Base Offense Level that would reflect that additional quantity of that controlled substance.

For example, if we assume that Weston was responsible for 5 kilograms of cocaine powder, that amount of cocaine powder would place him in Base Offense Level 30. Under the Guideline's drug equivalency formula of 200 grams of marijuana per gram of cocaine, the 5 kilograms of cocaine would represent 1,000 kilograms of marijuana. U.S.S.G. S 2D1.1, Application Note 10, Drug Equivalent Tables. One thousand kilograms of marijuana is the ceiling for Base Offense Level 30. Consequently, any additional marijuana equivalents would require a higher base offense level.

29

Therefore, if the district court found that Weston was responsible for 5 kilograms of cocaine powder and any measurable amount of crack cocaine -- which is equivalent to 20 kilograms of marijuana per gram -- it would have had to conclude that Weston was responsible for more than 1,000 kilograms of marijuana and it should therefore have applied a Base Offense Level above 30.

Moreover, even if we assume that Weston was responsible only for the lowest amount of cocaine powder covered by Level 30 (i.e., 3 kilograms), that quantity translates into a marijuana equivalent of 700 kilograms. Thus, any amount of crack above 15 grams (the equivalent of 300 grams of marijuana) would place Weston above the ceiling for level 30 and require a higher level. The evidence here certainly establishes that Weston was responsible for more than 15 grams of crack. Farris not only testified that he saw Weston transform "maybe a couple of hundred grams" of cocaine powder into crack, but also testified about another occasion when he was buying cocaine powder from Weston on the street. During that encounter, Weston dropped a clear plastic bag containing 7 to 10 grams of crack on the ground. Thus, Weston was clearly responsible for more than 15 grams of crack.

We agree that it would be highly problematic to attempt to attribute all of the crack that was mentioned to Weston for Guidelines purposes. That level of precision is not supported by the generalized estimates on this record. However, we conclude that the court erred in not at least attributing the 200 grams that Farris saw Weston manufacture. Given the totality of the evidence here, it is beyond debate that Weston manufactured and/or distributed, at least that much. We will therefore vacate Weston's sentence and remand for the district court to make an appropriate determination of Weston's Base Offense Level in light of our discussion.15, 16

_____

15. We take no position on the government's claim that on remand the district court should resentence Weston using a Base Offense Level of 34. The district court can best make that determination in the first instance.

16. In Apprendi v. New Jersey, 530 U.S. 466, 490 (2000), the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that

V. BOONE'S APPEAL

Boone makes six arguments in his appeal. We consider
each separately.

1. The District Court Erred by Admitting Evidence of
      Boone's Prior Drug-Trafficking.

Boone's defense at trial was that even though he
accepted $100 dollars to deliver a bag that happened to
_____

increases the penalty for a crime beyond the prescribed statutory
maximum must be submitted to a jury, and proved beyond a reasonable
doubt." Apprendi was not raised as an issue by Weston and was only
briefly alluded to at oral argument. However, in an over-abundance of
caution, we do think that a short discussion of Apprendi is warranted.

The superseding indictment charged Weston, Boone, Farris and Jones
with conspiring to distribute and possess with intent to distribute more
than 5 grams of cocaine base (crack) and more than 200 grams of
cocaine contrary to 21 U.S.C. S 841(a)(1) in violation of 21 U.S.C. S 846.
As noted above, the government filed an enhanced penalty information
against Weston, pursuant to 21 U.S.C. SS 841(b)(1)(B) and 851(a)(1). That
information referenced a 1992 state felony conviction for possession of
crack cocaine with intent to distribute, and Weston does not now
challenge that enhancement. As a consequence of his conviction, Weston
faces a possible statutory maximum penalty of life imprisonment. See 21
U.S.C. S 841(b)(1)(B) ("If any person commits such a violation [of S
841(a)]
after a prior conviction for a felony drug offense has become final, such
person shall be sentenced to a term of imprisonment which may not be
less than 10 years and not more than life imprisonment. . . .").

We recently applied Apprendi, and reiterated the proposition that the
limitations of Apprendi do not apply unless the quantity calculation
increases the statutory maximum the defendant is exposed to. If it does,
the calculation must be submitted to the jury and established beyond a
reasonable doubt. United States v. Vazquez, 271 F.3d 93, 98 (3d Cir.
2001). Here, however, the district court's drug calculation on remand
cannot possibly increase the statutory maximum. That maximum is
already set at life because of Weston's prior drug conviction. See United
States v. Cepero, 224 F.3d 256, 2676 n. 5 (3d Cir. 2000) (en banc)
(Apprendi does not apply where application of Sentencing Guidelines
does not implicate a fact that would increase the penalty beyond the
statutory maximum). See also United States v. Williams, 235 F.3d 858,
862-863 (3d Cir. 2000)(Apprendi does not apply to a situation where the
district court decides a fact that increases a defendant's sentence under
the Guidelines, but the sentence imposed does not exceed the statutory
maximum).

31

contain cocaine, he was an ignorant "go-fer" and did not know what he delivered. To meet that defense, the district court permitted the government to admit evidence of Boone's prior drug-trafficking activities pursuant to Fed. R. Evid. 404(b). However, the court gave a limiting instruction in which it informed the jury that the evidence was being admitted solely on the issue of Boone's knowledge of the contents of the bag, and to demonstrate his prior relationship with Farris and Mills. With that caution, the court admitted evidence that, on different occasions, Mills had observed Boone selling cocaine inside of the nightclubs where Mills worked. The district court also admitted evidence that Boone sold cocaine supplied by Farris. In addition, even though the government also tried to admit Boone's two prior drug-trafficking convictions into evidence, the district court limited the government to a stipulation that Boone had previously twice possessed cocaine with the intent to deliver it. Boone argues that the district court abused its discretion in admitting this evidence.

Rule 404(b) provides in relevant part that: "Evidence of other crimes, wrongs or acts . . . may . . . be admissible . . . for [certain] purposes, such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." (Emphasis added). Under Rule 404(b),[17] evidence of other criminal conduct is "admissible whenever relevant to a case other than [to show] the defendant's criminal propensity." United States v. Sriyuth, 98 F.3d 739, 745 (3d Cir. 1996). The prime inquiry is whether the evidence is probative of a material issue other than character. Huddleston v. United States, 485 U.S. 681, 687 (1988).

The prior crimes evidence was admitted to show that Boone was familiar with drug-trafficking practices and to establish that his relationship with Farris and Mills included drug-trafficking. The evidence demonstrated his "knowledge," "intent" and "lack of mistake or accident." It was properly admitted to rebut his defense of ignorance, and not to establish a propensity for criminal conduct.

_____

17. Admission of evidence under Rule 404(b) is reviewed for abuse of discretion. United States v. Balter, 91 F.3d 427, 436 (3d Cir. 1996).

32

Boone does not complain about the limiting instructions the trial court gave. The court cautioned the jury when the evidence was admitted and again as part of the final jury instructions, and those instructions were adequate to address concerns that the evidence would be used for an improper purpose.

Boone argues that evidence of his prior drug-trafficking offenses established no "logical inferences" that he knew the bag contained cocaine, as opposed to "stolen jewelry, or platinum dust." Boone's Br. at 9. However, that very argument illustrates the propriety of admitting evidence of Boone's prior drug involvement. The government correctly responds that evidence of one's familiarity with the subterfuge and concealment inherent in drug-trafficking was relevant to the issue of whether Boone may have believed the bag contained contraband other than cocaine. See United States v. Ferrer-Cruz, 899 F.2d 135, 138 (1st Cir. 1990).18

Finally, we conclude that evidence of Boone's prior drug-trafficking was harmless in any event. Farris testified that he asked Boone to deliver cocaine to Agent Hilton posing as "Malik," and that Boone agreed. Hilton testified that he received the cocaine from Boone in a manner that was characteristic of clandestine drug transactions and that the cocaine was plainly visible to Boone. Mills then testified that Boone acknowledged that he got involved because he was then actively dealing drugs.

_____

18. In Ferrer-Cruz, the court stated:

> Since one who has previous experience with drugs is . . . more likely
> to recognize (and hence to know) that the bags' contents were drugs
> that one without such experience, the inference at issue do not
> involve character. . . . Moreover, the probative value of the evidence
> . . . is quite high. . . . [A] juror might have though that the
> government failed to prove anything beyond [appellant's] presence in
> a car with cocaine; and, believing that the government failed to
> prove [appellant] knew it was cocaine or that he intended to deliver
> cocaine to the co-defendants, such a juror might have voted to
> acquit. The evidence of a past conviction might have helped
> convince a juror of guilt through its permissible suggestion that
> [appellant] knew about drugs and drug possession.

899 F.2d at 138.

Boone also challenges the district court's admission of Mills' testimony that between 1984 and 1986, he observed Boone selling cocaine inside the restrooms of two nightclubs where Mills worked. In pressing this objection, he concedes that the evidence was "minimally relevant to knowledge." He claims, however, that its probative value was outweighed by its prejudicial effect and it was therefore inadmissible under the balance required by Fed. R. Evid. 403. Boone did not object to this testimony under Rule 403 in the district court. We therefore again review for plain error, but Boone does not argue plain error even now. Rather, he spends a great deal of time arguing that Mills' testimony was incredible or unreliable. That was clearly an issue for the jury to resolve, and it apparently did so in favor of the government. Moreover, given Boone's "innocent go-fer" defense, this evidence was proper under Rule 403.

2. Sufficiency of the Evidence.

Boone argues that evidence of his knowledge of the contents of the package he delivered was insufficient to sustain his conviction. He insists that he "never shared a unity of purpose with Farris, and that he never even spoke with Weston during the time-frame of the charged conspiracy." He maintains that "he was never told, and had no dependable basis to know, what was in the package he delivered to Agent Hilton." Boone's Br. at 17. However, Farris' testimony by itself is sufficient to support Boone's conviction, and the jury apparently credited that testimony. Farris testified that he: (1) selected Boone to deliver the cocaine to Hilton because of Boone's long-standing ties to Mills and Boone's prior drug dealing for Farris; (2) told Boone that he wanted him to deliver cocaine and offered Boone $100 and an eighth of an ounce of cocaine for the job; and (3) Boone took the cocaine and agreed to deliver it. See United States v. Hernandez, 962 F.2d 1152, 1156 (5th Cir. 1992)(uncorroborated testimony of cooperating co-conspirators that they had conspired to sell drugs, and that appellant knew of, joined, and helped effectuate the conspiracy, was sufficient to support conviction for violation of 21 U.S.C. S 846).

34

Nonetheless, Boone argues Farris' testimony is not sufficient because, according to Boone, on cross-examination Farris "clarified that he only told Boone he had a deal for him, and there was no specific mention of drugs." Boone's Br. at 17. However, Boone mischaracterizes the testimony Farris offered on cross-examination. When asked: "what exactly did [he] say to Mr. Boone," Farris testified:

> That I had something for him, a deal going in on a few days and I asked him, did -- did he want to be a part of it or something like that.

Farris failed to offer a verbatim recitation of what he told Boone, even though he was asked for one. Farris related only that he said "something like that." Farris' testimony was not an admission that he failed to tell Boone that the package Boone delivered contained cocaine. Moreover, this argument again establishes the propriety of the aforementioned 404(b) evidence. Assuming that Farris only discussed the delivery in vague terms such as "doing a "deal," it was important for the jury to understand Boone's familiarity with the kind of vagaries that could cloak discussions of a drug delivery.

In any event, the evidence was sufficient to sustain Boone's conviction regardless of any inconsistency in Farris' direct and cross-examination testimony. A jury is free to believe part of a witness' testimony and disbelieve another part of it. United States v. Prince, 883 F.2d 953, 958 n.3 (11th Cir. 1989). Thus, a witness' testimony is not insufficient to establish a point simply because he or she later contradicts or alters it. See United States v. Stirone, 311 F.2d 277, 284 (3d Cir. 1963)(evidence was sufficient even though testimony of a government witness was to some extent self-contradictory). Furthermore, we review the sufficiency of the evidence in the light most favorable to the verdict winner, and we credit all reasonable inferences that support the verdict. United States v. Riddick , 156 F.3d 505, 508 (3d Cir. 1998). We will sustain the verdict if any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt based upon the evidence viewed in that light. United States v. Voigt, 89 F.3d 1050, 1080 (3d Cir. 1996).

35

The jury here could easily have credited Farris' direct testimony that Boone agreed to deliver what he was told was a package of cocaine, notwithstanding any purported inconsistency on cross-examination. Accordingly, we conclude that the evidence was sufficient to support Boone's conviction.

3. The District Court Erred by Not Granting
   a New Trial Based on the Government's Failure
   to Disclose Brady Material.

Boone claims that the government failed to disclose two items of exculpatory information in violation of Brady v. Maryland, 373 U.S. 83 (1963) and its progeny, and he is therefore entitled to a new trial.

In Brady v. Maryland, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. The affirmative duty to disclose includes impeachment evidence as well as exculpatory evidence. United States v. Bagley , 473 U.S. 667, 676 (1985). In Strickler v. Greene, 527 U.S. 263 (1999), the Court wrote:

> [T]he term "Brady violation" is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence--that is, to any suppression of so-called "Brady material"--although, strictly speaking, there is never a real "Brady violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict. There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

Id. at 281-82.

The first claimed Brady violation is a statement of a confidential informant. Boone first learned about this confidential informant in the Presentence Report, which read, at P 9, as follows:

> In early 1997, [law enforcement officials] received information from a confidential source19 . . . that several individuals, including THOMAS WESTON, a/k/a Rasul; CURTIS FARRIS, a/k/a C-Allah; LARRY BOONE, a/k/a God Supreme; and HERBERT JONES were responsible for the distribution of significant quantities of "crack" in the Asbury Park area.

After he received a draft of the PSR, Boone, by letter dated May 12, 1999, sought disclosure of information relating to this informant. The government responded by informing Boone that the informant had stopped cooperating with the authorities before Boone was released from state prison in early 1997. In other words, the government conceded that the representation in the PSR that the confidential informant had provided information about Boone was erroneous.

Nonetheless, Boone claims this non-disclosure violated due process. The argument is, however, somewhat difficult to follow. If the confidential informant made the statement about Boone, it certainly would not be exculpatory or material. On the contrary, if the statement was made it would have been inculpatory and not subject to Brady disclosure. In any event, Boone contends that if the PSR was correct, i.e., had the confidential informant made an inculpatory statement about him, he (Boone) could have called the confidential informant as his own witness and established that the allegations were false. He claims he "could have impeached the unknown informant and shown that Boone had been falsely accused of being an early coconspirator, which created a domino effect, causing Mills, Farris, and Agent Hilton to either lie or mold their stories to fit the framework of their target conspiracy." Boone's Br. at 19-20.

_____

19. Stewart Mills, who testified at trial, is identified as a second confidential informant in P 9 of the PSR, and is not the same person identified in this excerpt.

37

However, Boone fails to tell us how his new twist on the "domino theory" would have exculpated him. Moreover, even if we assume that Boone could have somehow shown that the confidential informant had falsely implicated him, he has not even attempted to establish that Mills, Farris and/or Hilton were even aware of the informant's statement, or that they perjured themselves and conspired to "mold their testimony" to conform to it.

Alternatively, Boone suggests that even if the government was correct that the confidential informant's statement was wrong, the statement was actually exculpatory because he could have used the statement to show the jury that he could not have been a member of the Weston, Farris and Jones drug conspiracy during the time he was in state prison. However, assuming arguendo that the statement would be exculpatory as posited, Boone has not shown that it was material. The test for materiality is whether the failure to disclose prejudiced the defendant, i.e., whether the failure to disclose undermined confidence in the outcome of the trial. See Smith v. Holtz, 210 F.3d 186, 195–200 (3d Cir. 2000). The fact that Weston, Farris and Jones were engaged in drug-trafficking prior to Boone's release from state prison does not negate Farris' testimony that he recruited Boone after Boone's release from prison for the express purpose of delivering cocaine to Agent Hilton on July 11, 1997. In fact, it corroborates that testimony. Once Boone agreed to the July 11th transaction, he joined the conspiracy.

The second Brady violation Boone asserts involves a statement co-defendant Jones made to a pre-sentence investigator after pleading guilty. Jones told the investigator that Weston typically wrapped his drugs in brown paper bags. According to Boone, he could have used this information to show that the cocaine Farris received from Weston and gave to Boone was wrapped in a brown paper bag, thereby preventing Boone from knowing that cocaine was inside. However, Boone did not need Jones' statement to establish this because Farris testified that the cocaine he delivered to Boone was wrapped in a brown paper bag. Thus, Jones' statement would have been cumulative and, consequently, not material. See United States v. Burns, 162

38

F.3d 840, 851 (5th Cir. 1998)(non-disclosure of information that supported the defense theory that fraudulent billing was caused by untimely reimbursements by victim agency was not material because it was merely cumulative of other evidence elicited by defense on this point). Moreover, Agent Hilton testified that by the time Boone delivered the cocaine to him, it was in a clear plastic bag. Jones' statement does not contradict that statement because the cocaine was wrapped in a clear plastic bag that was then placed in the brown paper bag that was handed to Boone.

4. The District Court Erred in Instructing
        the Jury That It Could Consider Evidence That
        Boone Attempted to Influence a Witness as
        Indicative of Consciousness of Guilt.

Boone argues that the court erred in instructing the jury that evidence of the threatening letter Farris received (apparently from Weston, or at his direction) could be considered as consciousness of guilt. That evidence, which we have set forth above, was admitted without objection, and Boone does not challenge its admission here. Boone objected to the charge at trial, but was overruled. He does not now argue that the charge did not accurately state the law. Rather, he argues that the district court's charge was unfair and inappropriate. First, he argues that it was unfair because it "lump[ed] together" Boone's and Weston's prison contacts with Farris. Boone's Br. at 23. He argues this was unfair because Weston asked Farris to lie, but he (Boone) simply asked Farris to tell the truth. That is, Boone maintains that he asked Farris to "truthfully" state that Boone innocently accompanied Farris to the Collingwood Auction to ask Mills for a legitimate job, not knowing that Farris had solicited Boone to deliver cocaine. This argument again misstates the trial testimony. Farris testified that he clearly and fully informed Boone that Boone was being hired to deliver cocaine. According to Farris, Boone did not accompany Farris to the Collingwood Auction to ask Mills for a job.

Boone's other arguments about the consciousness of guilt instruction are equally meritless. Boone claims that the instruction was unwarranted because "the government

39

placed their witnesses among his co-defendants in[the jail] . . . and continuous banter went back and forth to and from Farris." Boone's Br. at 44. Although Boone's point here is rather elusive, we assume (as does the government), that Boone is suggesting that the government attempted to entrap Boone by creating an opportunity for him to discuss his drug dealing in front of Farris after Farris agreed to cooperate. This is apparently based upon an argument that the government intentionally failed to segregate Farris from Boone and Weston after Farris began cooperating. Boone does not offer any proof to support this claim, and we fail to see the legal basis for an "entrapment" claim even if Boone had such evidence. Therefore, this argument must fail.

Finally, Boone claims that Farris, not Boone, initiated their discussion in the library regarding drafting an exculpatory letter. However, that argument misses the point, and is also contradicted by Farris' testimony. The fact that the defense presented other prison inmates who claimed that Farris admitted to them that Weston and Boone were not guilty of the charges only created a jury question regarding Farris' credibility. The court properly left that question to the jury.

5. The District Court Erred by Not Charging
       That a Single Transaction Does Not Establish
       Conspiracy Membership, or That a Member Can
       Constructively Terminate His Membership.

Boone argues that the district court improperly denied his request for an instruction that his involvement in a single transaction did not prove that he was guilty of conspiracy. He relies upon our decision in United States v. Price, 13 F.3d 711, 726-29 (3d Cir. 1994). There, we reversed a jury instruction that a defendant could be guilty of conspiring to distribute cocaine by offering to buy cocaine from a member of the conspiracy, even if the buyer had no intention of reselling the cocaine. Here, however, Boone did not buy drugs; he delivered them. Thus, Price does not help him. In fact, the evidence clearly demonstrated that Boone was brought into the conspiracy to deliver Weston's cocaine, collect the purchase price and

remit it to Farris. Boone was only to be paid if he delivered the cocaine, and Weston and Farris would receive the money only if Boone delivered the cocaine and collected the sales price. This is sufficient to prove a conspiracy. See United States v. DiPasquale, 740 F.2d 1282, 1292 (3d Cir. 1984). Accordingly, the district court properly denied the requested instruction.

Moreover, the evidence refutes Boone's claim that he was only involved in one illegal act. Farris selected Boone to deliver cocaine to "Malik" on July 11th because Boone had previously delivered cocaine for Farris and because Boone was friendly with Mills. Farris' subsequent attempt to use Boone for another delivery to "Malik" on August 1, was stymied only because Farris could not find Boone. Meanwhile, Boone was assuring Mills that he (Boone) could provide Mills with large amounts of cocaine to sell. This evidence establishes Boone as a member of an ongoing conspiracy; not a one-time participant.

The district court instructed the jury that, after joining a conspiracy, a person may terminate his involvement only by "an affirmative act of termination . . . withdrawal or disassociation." Boone argued that he was entitled to a "constructive termination" instruction based on the argument that he constructively terminated his membership in the conspiracy by participating in only one transaction. He has presented no authority for that rather novel proposition, and we are not aware of any. Rather, we believe the district court accurately stated the law. Boone was required to make a prima facie showing of affirmative acts to defeat or disavow his membership in the conspiracy. Such acts of disavowal include making a full confession to authorities or renouncing the conspiracy to the co-conspirators. United States v. Antar, 53 F.3d 568, 582 (3d Cir. 1995). The mere cessation of activity is insufficient to establish withdrawal. Id. at 582. Boone did nothing to attempt to withdraw. Therefore, the district court did not err in refusing to give the requested jury instruction.

41

6. The District Court Erred by Finding
       that Boone Did Not Accept Responsibility
       for his Crime.

Finally, Boone claims that the district court committed clear error by finding that he did not "accept responsibility" for his crimes and declining to reduce his Offense Level pursuant to U.S.S.G. S 3E1.1. A defendant seeking a reduction for acceptance of responsibility bears the burden of establishing by a preponderance of the evidence that he or she is entitled to the reduction, and we review the district court's denial of the reduction for clear error. United States v. Muhammad, 146 F.3d 161, 167 (3d Cir. 1998). The district court's denial of the reduction is entitled to "great deference" because "[t]he sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility." U.S.S.G. S 3E1.1, Application Note 5.

Boone's claim of acceptance of responsibility is hard to take seriously. It is based upon a statement he gave to investigators after he was arrested that he now argues was "in all respects a complete confession." Boone's Br. at 28. After his arrest, Boone waived his Miranda rights and agreed to give a statement to investigators. In that statement he claimed that, on July 11, 1997, Farris asked him to do a favor and "give this guy a package." Boone said he agreed, and Farris drove Boone to the Collingwood Auction. Boone admitted that he delivered the package, and that he skimmed $100 from the money that he received from "Malik." He denied any knowledge of Farris' cocaine supplier. Boone did not admit that he committed the charged offenses, and he did not admit that he knew the package contained cocaine. Given the evidence here, his "cooperation" is more a false exculpatory statement than an acceptance of responsibility. A defendant does not earn the acceptance of responsibility reduction simply by speaking to investigators. See United States v. DeLeon-Rodriquez, 70 F.3d 764, 767 (3d Cir. 1995)(district court did not commit plain error by denying acceptance reduction where appellant's pre-trial statement to investigators stopped short of a full confession). Continuing his game of"cat and mouse," Boone argues that he did not admit that he knew that the package contained drugs because he was not

42

specifically asked by the investigators. However, we cannot help but cast a particularly jaundiced eye on that assertion because it strikes us as nothing more than a post-hoc fabrication to buttress his appeal.

Boone would be hard pressed to demonstrate that he accepted responsibility even with his post-arrest statement. He seeks the benefit of the portion of U.S.S.G.S 3E1.1 Application Note 2, that provides that "where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e. g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct)", a defendant may be entitled to the acceptance of responsibility reduction. That provision is of no avail here.

Initially, Boone attempted to rely on the panel opinion in United States v. Singleton, 144 F.3d 1343 (10th Cir. 1998)(Singleton I), which held that the government was barred from making promises of leniency to cooperating witnesses in exchange for their truthful testimony against a defendant. Thus, he filed a pre-trial motion seeking to suppress Mills' testimony based on Singleton I . He concedes that his suppression motion was probably a dead letter by the time of trial because the panel decision had been reversed by the Court of Appeals for the Tenth Circuit en banc. 165 F.3d 1297 (10th Cir.) (Singleton II).20 Nonetheless, he claims that even though the Court of Appeals for the Tenth Circuit repudiated Singleton I by the time of his trial, we had not as yet addressed the issue.21  Thus, he argues that he continued to fall under the exception explained in Application Note 2.

However, we are hard pressed to see how Boone could seriously argue for an acceptance of responsibility reduction. He opposed the admission of relevant, inculpatory evidence, and challenged as incredible the testimony of government witnesses Mills, Farris and Agent Hilton. We think the law is clear that such actions are

_____

20. The Supreme Court later denied a petition for certiorari. 527 U.S. 1024 (1999).

21. When this appeal was argued we had decided United States v. Hunte, 193 F.3d 173 (3d Cir. 1999) in which we rejected Singleton I.

43

inconsistent with the "acceptance of responsibility" reduction in the Guidelines. United States v. DeLeon-Rodriquez, 70 F.3d at 767 (acceptance of responsibility reduction properly denied because appellant challenged the admission of and accuracy of the government's trial evidence, and argued for a verdict of not guilty).

VI. CONCLUSION

For all of the above reasons, we will affirm Boone's sentence of judgment and conviction and will affirm Weston's conviction. However, we will vacate Weston's sentence and remand solely for the district court to determine his Base Offense Level consistent with our opinion.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit

44