**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 16-1682
_____

UNITED STATES OF AMERICA

v.

DONALD WOMACK, SR.,
a/k/a KAS,
a/k/a Kasul,
a/k/a D-Rock

Donald Womack, Sr.,
                           Appellant

_____

No. 18-1605
_____

UNITED STATES OF AMERICA

v.

SPENCER PAYNE, also known as BOODINE, also known
as NUR,

Spencer Payne,
                           Appellant

_____

No. 18-2560
_____

UNITED STATES OF AMERICA

v.

BREON BURTON,
a/k/a BRE,

Breon Burton,
                        Appellant

_____

No. 19-3935
_____

UNITED STATES OF AMERICA

v.

RONELL WHITEHEAD,
                        Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(District Court Nos. 2-14-cr-0323-002, 2-14-cr-0323-011,
2-14-cr-0323-008, and 2-14-cr-0323-006)
District Judge:  Honorable Gerald A. McHugh

_____

Argued March 14, 2022

Before:  JORDAN, RESTREPO, and PORTER, *Circuit Judges*

(Opinion filed: November 29, 2022)

Richard Coughlin
Julie A. McGrain **[Argued]**
Office of Federal Public Defender
800-840 Cooper Street, Suite 350
Camden, New Jersey 08102

*Counsel for Appellant Donald Womack, Sr.*

2

Martin I. Isenberg **[Argued]**
Scher & Isenberg, LLC
Two Penn Center Plaza, Suite 1020
Philadelphia, PA 19102

*Counsel for Appellant Spencer Payne*

Carina Laguzzi **[Argued]**
Laguzzi Law, P.C.
P.O. Box 30095
Philadelphia, PA 19103

*Counsel for Appellant Breon Burton*

Peter Goldberger **[Argued]**
Pamela A. Wilk
50 Rittenhouse Place
Ardmore, PA 19003

*Counsel for Appellant Ronell Whitehead*

Jacqueline C. Romero
Robert E. Eckert, Jr.
Robert A. Zauzmer **[Argued]**
Emily McKillip
A. Nicole Phillips
Office of United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106

*Counsel for Appellee United States of America*

---

OPINION OF THE COURT

---

**RESTREPO**, *Circuit Judge*

These four separate appeals, consolidated for purposes of disposition, arise from guilty verdicts rendered after a jury trial on drug trafficking conspiracy charges and other related

3

criminal charges against appellants Donald Womack, Sr., Spencer Payne, Breon Burton, Ronell Whitehead (collectively "Appellants"),[1] and three additional co-defendants. Appellants appeal various aspects of their convictions and sentences. For the reasons that follow, we affirm the Judgments of conviction and sentence.

## I.

### (A) THE INVESTIGATION, INDICTMENT, AND INDIVIDUAL CHARGES

In 2012, the Drug Enforcement Administration ("DEA"), the Federal Bureau of Investigation ("FBI"), and the City of Chester Police Department initiated a joint investigation of a drug trafficking conspiracy ("Rose and Upland DTG" or "DTG") that operated primarily in the Rose and Upland neighborhood of the City of Chester, Pennsylvania. Using confidential informants, controlled purchases of narcotics, surveillance, pole cameras, pen registers, and court-authorized wiretaps of co-conspirators William Dorsey and Paris Church, the investigative team identified alleged members of the conspiracy, including Appellants.

The investigation revealed evidence supporting charges that Appellants were members of the Rose and Upland DTG that sold cocaine base ("crack"), powder cocaine ("cocaine"), and heroin. Evidence supported the Government's position that defendant William Dorsey was the head of the DTG, and that Appellants were co-conspirators with Dorsey and the other members of the DTG.

---

[1] Appellants have each filed their own briefs on appeal raising issues challenging the convictions and sentences, respectively, and the Government has filed a separate responsive brief in each of the four appeals responding to the claims raised by each Appellant. Separate appendices were filed in each of Appellants' appeals. Therefore, specific citations to the appendices and briefs referred to below identify in which Appellant's appeal the respective appendices and briefs were filed.

The evidence indicated that DTG members routinely carried, and sometimes used, loaded firearms or had firearms available in hidden locations, including their stash locations. In particular, to facilitate their drug trafficking, members of the DTG illegally carried guns and stashed both drugs and guns in alleyways and in a nearby playground.

During the course of the investigation, law enforcement conducted numerous controlled purchases of drugs from members of the DTG, using cooperating sources and undercover officers. The controlled purchases were surveilled, audiotaped, and videotaped by the DEA and the FBI.

On April 1, 2015, a federal grand jury returned a 261-count Second Superseding Indictment ("the Indictment"), charging Appellants and 18 others with conspiracy to distribute 280 grams or more of crack, 500 grams or more of cocaine, and 100 grams or more of heroin, in violation of 21 U.S.C. § 846 (Count 1). Count One alleged that these individuals comprised a conspiracy that the Government labeled the "Rose and Upland Drug Trafficking Group" because the alleged criminal enterprise was centered in the vicinity of Rose and Upland Streets in Chester.

In addition to the conspiracy count, the Indictment charged alleged co-conspirators with various substantive counts ("individual substantive charges"), respectively. These individual substantive charges included distribution of controlled substances (including heroin, crack, and cocaine), possession of controlled substances with intent to distribute, and firearms charges, which included possession of firearms by felons and possession of firearms in furtherance of a drug trafficking offense. Some Appellants entered guilty pleas to individual substantive charges against them, but none of them pled guilty to the conspiracy charge (Count One).

With regard to Womack, the individual substantive charges against him were two counts of unlawful use of a communication facility in furtherance of a drug trafficking offense, in violation of 21 U.S.C. § 843(b) (Counts 163 and 191), one count of possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C)

5

(Count 170), one count of conspiracy to possess marijuana with intent to distribute, in violation of 21 U.S.C. § 846 (Count 260), and one count of attempt to possess marijuana with intent to distribute, in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2 (Count 261).  On February 20, 2016, the District Court granted the Government's motion to dismiss Counts 260 and 261 without prejudice.

As for Payne, the Indictment charged him with seven counts of distribution of crack and cocaine, in violation of 21 U.S.C. § 841(a)(1) (Counts 52, 62, 70, 72, 130, 153, and 183), six counts of distribution of crack within 1,000 feet of a school, in violation of 21 U.S.C. § 860 (Counts 53, 63, 71, 73, 131, and 154), and five counts of use of a communication facility in furtherance of a drug felony, in violation of 21 U.S.C. § 843(b) (Counts 125, 141, 184, 185, 188).  He proceeded to trial on all counts.

Burton was charged with: distribution of heroin, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) (Counts 6, 8, 10, and 14); distribution of heroin within 1,000 feet of a protected location, in violation of 21 U.S.C. § 860(a) (Counts 7, 9, 11, and 15); distribution of crack and heroin, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) (Counts 20, 24, 32, and 37); distribution of crack and heroin within 1,000 feet of a protected location, in violation of 21 U.S.C. § 860(a) (Counts 21, 25, 33, and 38); distribution of crack in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) (Count 26); distribution of crack within 1,0000 feet of a protected location, in violation of 21 U.S.C. § 860(a) (Count 27); distribution of cocaine and heroin, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) (Count 39); distribution of cocaine and heroin within 1,0000 feet of a protected location in violation of 21 U.S.C. § 860(a) (Count 40); possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Count 41); being a felon in possession of a firearm, in violation of 21 U.S.C. § 922(g) (Count 42); and possession of crack with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) (Count 43).  On February 9, 2016, Burton pled guilty to all of these individual substantive charges.

With regard to Whitehead, the Indictment charged him with three counts of distribution of crack, in violation of 21 U.S.C. § 841(a)(1) (Counts 50, 62, and 90), and three associated counts of distribution of crack within 1,000 feet of a protected location, in violation of 21 U.S.C. § 860 (Counts 51, 63, and 91). On October 23, 2015, Whitehead entered an open guilty plea to these individual substantive charges.

### (B) THE TRIAL, CONVICTIONS, AND SENTENCES

On February 22, 2016, seven co-defendants (the four Appellants, along with Paris Church, Jamear McGurn, and John Dennis) proceeded to trial on the Count One conspiracy charge against each of them and the remaining additional individual substantive charges against the respective co-defendants. Nearly a month later, in March of 2016, a jury found, among other things, all four Appellants guilty of Conspiracy. In addition, some Appellants were found guilty of individual substantive charges.

In addition to the Conspiracy conviction, Womack was convicted on the individual substantive charges of unlawful use of a communication facility in Counts 163 and 191. He was acquitted on Count 170 (cocaine possession with intent to distribute). The District Court sentenced Womack to 216 months on Count One Conspiracy and 48 months on each of Counts 163 and 191, to be served concurrently to each other and to Count One, for a total aggregate sentence of 216 months. The Court also imposed five years of supervised release and a $400 special assessment.

Payne was convicted by the jury of five counts of distribution of crack and cocaine (Counts 52, 62, 70, 72, and 183), four counts of distribution of controlled substances within 1,000 feet of a school (Counts 53, 63, 71, and 73), and five counts of use of a communication facility in furtherance of a drug felony (Counts 125, 141, 184, 185, and 188). The jury acquitted Payne on two counts of crack distribution (Counts 130 and 153) and two counts of crack distribution in a school zone (Counts 131 and 154). On March 6, 2018, the District Court sentenced Payne to a prison term of 192 months, to be followed by a term of supervised release of six

7

years, and he was ordered to pay a special assessment totaling $1,100.00.

Burton pled guilty to all 23 counts against him, except the Conspiracy charge, of which the jury found him guilty. The District Court sentenced Burton on July 6, 2018 to 300 months in prison, to be followed by a term of supervised release of eight years, and a special assessment of $1,400.

Whitehead, who pled guilty to the six individual substantive charges against him, was convicted by the jury of the Conspiracy charge. The District Court sentenced Whitehead on December 10, 2019, and imposed a sentence of 264 months in prison on Count One, and 216 months in prison on Counts 51, 63, and 91, to be served concurrently with the sentence on Count One.[2] The District Court further imposed 10 years of supervised release on Count One, and a term of six years of supervised release on each of Counts 51, 63, and 91, such terms to run concurrently, and a $400 special assessment.

Following sentencing, Appellants filed timely notices of appeal, respectively, and the appeals were consolidated for purposes of disposition. [3]

## II.[4]

---

[2] No sentence was imposed on Counts 50, 62, and 90 because they were lesser included offenses of Counts 51, 62, and 91, respectively, and therefore merged for sentencing purposes.

[3] Womack filed a premature notice of appeal on March 28, 2016, one week after the jury returned its guilty verdict, and this Court ordered the appeal stayed pending entry of a Judgment and Commitment Order by the District Court. The District Court imposed sentence on April 5, 2019 and entered its Judgment on April 10, 2019. Womack filed a duplicate notice of appeal on April 18, 2019.

**(A)   CHALLENGES TO CONVICTIONS**

**1. Womack's and Whitehead's Claims of
Improper Expert Testimony in Violation of
Evidence Rule 704(b)**

Appellants Womack and Whitehead argue that the District Court violated Federal Rule of Evidence 704(b) because they contend the Government's expert witness on drug trafficking organizations, DEA Special Agent Randy Updegraff,[5] was allowed to opine on the ultimate issue of Appellants' intent to engage in a conspiracy.[6]   Pointing out that Special Agent Updegraff, a lead case agent, testified both as a fact witness and, when recalled, as an expert, Womack and Whitehead complain that Updegraff's testimony constituted a prohibited opinion on the Appellants' intent to agree, an element of the charged offense of conspiracy. Womack and Whitehead further argue on appeal that admission of this testimony was prejudicial error, and therefore requires reversal and remand for a new trial.

The Government responds that Updegraff's testimony "does not trespass on the jury's function."  Gov't Resp. to Womack Br. 18.  Further, it points out that "[m]uch of Updegraff's testimony [as an expert] . . . related to terminology used by the defendants." *Id.* at 19.

---

[4] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231.  We have jurisdiction pursuant to 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

[5] Special Agent Updegraff was qualified as an expert witness in narcotics trafficking, and Appellants do not dispute his qualification.

[6] "Womack joins Whitehead in his argument regarding the District Court's (alleged) error in allowing DEA Special Agent Randy Updegraff to offer his opinion as an expert witness that the evidence at trial was consistent with collective, group drug distribution and inconsistent with independent, separate drug dealing by the defendants." Womack Br. 18 (parenthetical added).

We review the District Court's decision to admit the challenged testimony in this case for abuse of discretion.[7] *See United States v. 68.94 Acres of Land*, 918 F.2d 389, 392 (3d Cir. 1990). We will reverse only if the error "affected the outcome of the district court proceedings." *See United States v. Amirnazmi*, 645 F.3d 564, 594 (3d Cir. 2011) (quoting *United States v. Vazquez-Lebron*, 582 F.3d 443, 446 (3d Cir. 2009) (internal quotation marks omitted)). An error is harmless when it is "highly probable that it did not prejudice the outcome."[8] *United States v Cross*, 308 F.3d 308, 317 (3d Cir. 2002).

Federal Rule of Evidence 704(b) provides: "In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone." Here, the Government argues that Agent Updegraff carefully confined his testimony to the matters permitted by Rule 704.

"[E]xperienced narcotics agent[s] may testify about the significance of certain conduct or methods of operation to the drug distribution business, as such testimony is often helpful in assisting the trier of fact understand the evidence." *United States v. Griffith*, 118 F.3d 318, 321 (5th Cir. 1997) (quoting *United States v. Washington*, 44 F.3d 1271, 1283 (5th Cir. 1995)). Thus, "[e]xpert testimony concerning the *modus operandi* of individuals involved in drug trafficking does not violate Rule 704(b)." *United States v. Watson*, 260 F3d. 301, 308 (3d Cir. 2001). For example, an expert may testify about the various counter-surveillance techniques used by drug dealers to avoid detection by the police. *Id.*

---

[7]The defendants collectively objected to Agent Updegraff's expert testimony on this issue at trial, and their objections were overruled.

[8] Whitehead's counsel on appeal acknowledged at argument that harmless error is the standard applicable to this claim. *See also* Womack Br. 18 (arguing that "[a]dmission of this testimony was prejudicial error").

10

"Expert testimony is admissible if it merely 'support[s] an inference or conclusion that the defendant did or did not have the requisite mens rea, so long as the expert does not draw the ultimate inference or conclusion for the jury and the ultimate inference or conclusion does not necessarily follow from the testimony.'" *Id.* at 309 (quoting *United States v. Bennett*, 161 F.3d 171, 183 (3d Cir. 1998)). "It is only as to the last step in the inferential process – a conclusion as to the defendant's mental state – that Rule 704(b) commands the expert to be silent." *Id.* (quoting *United States v. Dunn*, 846 F.2d 761, 762 (D.C. Cir. 1988)). "Rule 704(b) may be violated when the prosecutor's question is plainly designed to elicit the expert's testimony about the mental state of the defendant, or when the expert triggers the application of Rule 704(b) by directly referring to the defendant's intent, mental state or mens rea." *Id.* at 309 (citations omitted).

Appellants contend the following testimony "veered into territory barred by Rule 704(b)," *see* Whitehead Br. 19:

> Q: And Agent Updegraff, can you give the jury some examples of indicia that a group is operating in a particular area. And if you want to distinguish it to Chester versus Philadelphia or some other area, that is fine as well.
>
> A: Sure, in this instance, in this case, some of the indicia of operating as a group is what we would consider is when you have individuals operating in an area, the time period that they are out in the area, the locale, whether the area is kind of secreted from easy view by law enforcement. The operation of the individuals that are in this area, whether as we've seen in this case using alleyways to hide from law enforcement. Secreting their narcotics in alleyways. Part of it being a group activity is the alleyways are utilized by numerous, numerous individuals to secrete narcotics, which gives an

11

indication to me that there is a level – there is a level of trust in the area, that they can secrete their narcotics in these alleyways without fear of them being taken by other members of the group. Also, the shared sales that we've observed throughout the course of this is another indication. Also the weapons that we find that were recovered during the course of – during the course of this investigation.

Whitehead App. 1779. Womack and Whitehead believe that, "[t]hough the prosecutor's question was mainly phrased in general terms, the agent's answers were specific to this case and directly stated that the defendants acted as a group." Whitehead Br. 20.

The Government responds that Updegraff's testimony merely points "to a number of factors that, in his experience, indicate that people in the drug trade are operating together" and that "[n]ot surprisingly, he testifies about factors that are supported by the evidence in this case." Gov't Resp. to Womack Br. 18. They contend, "There would be no point in Updegraff reeling off a list of indicia that he has seen in other cases, but that were not present in this case," and that the "jury was left to exercise its own judgment about whether the evidence proved the facts . . . [and] whether those facts indicate in this case that the defendants have agreed to work together." *Id.*

As Whitehead's counsel on appeal acknowledged at argument, Appellants primarily challenge Updegraff's testimony referring to the defendants as a "group." *Id.* In support of this argument, Womack and Whitehead point to the following testimony:

> Q: What about fighting amongst – have you encountered instances where individuals are fighting amongst each other?

12

A:  . . . Sometimes these individuals don't have the best conflict resolution skills.  So I have encountered within the group where there have been instances of conflict.  *But in this case, no.  What we did see in this particular group was* individuals from outside the area were not welcome.

Whitehead Br. 20-21 (quoting Whitehead App. 1781-1782) (emph. added by Whitehead).  Womack and Whitehead complain that Updegraff's testimony drew the ultimate conclusion for the jury as to the mens rea element of agreement and related intent – that the defendants acted in concert, as a group, in distributing drugs.

The Government responds that Updegraff did not improperly opine on the ultimate issue of Appellants' mens rea.  Rather, the Government argues, Womack and Whitehead are aggrieved because Updegraff's testimony helped disprove their contention that all the people selling drugs in the Rose and Upland neighborhood were acting alone.

We are not persuaded by Appellants' argument to the extent they argue Updegraff's reference to the defendants as a "group" was "tantamount to testifying as to the specific defendants and their intent to agree."  Whitehead Br. 21.  The mere use of the collective noun, "group," or similar collective nouns generally, do not equate to providing an opinion that a particular group – here, consisting of long-term residents who frequented the Rose and Upland area – had formed any intent to agree on a common objective or had any common intent or mental state, much less that they formed an agreement to distribute drugs, and therefore had become a conspiracy.  A collective noun, such as "group," does not, as Womack and Whitehead suggest, necessarily imply a mens rea of common agreement or intent.

Furthermore, even assuming *arguendo* the instances of Updegraff's testimony challenged by Whitehead and Womack otherwise crossed the Rule 704(b) line, and that the admission of this evidence were erroneous, any error was harmless in light of the other evidence.  The evidence at trial

13

indicated that Womack and Whitehead were members of the DTG, which sold crack, cocaine, and heroin, primarily in the area of Rose and Upland Streets in Chester. Evidence showed that defendant William Dorsey was the head of the DTG, and that Womack and Whitehead were co-conspirators with Dorsey and the other members of the DTG.

Evidence further showed that DTG members routinely carried, and sometimes used, loaded firearms or had firearms available in hidden locations including their stash locations. To facilitate their drug trafficking the members of the DTG illegally carried guns and stashed both drugs and guns in alleyways and in a nearby playground. Law enforcement conducted numerous controlled purchases of drugs from members of the DTG, using cooperating sources and undercover officers. Controlled purchases and use of firearms were surveilled, audiotaped, and videotaped by the DEA and the FBI. We find that any arguable violation of Rule 704(b) was harmless and not reversible error in light of the evidence that supports Womack's and Whitehead's membership in the conspiracy.

### 2. Claims of Womack and Whitehead Regarding Jury Instructions and Interrogatories on Attributable Drug Quantity

Appellants Whitehead and Womack[9] argue that the District Court erred in its instructions and interrogatories to the jury concerning the quantity of drugs for which they were held responsible. Because an objection in this regard was not preserved at trial, this argument is reviewed on appeal for plain error. *United States v. Boone*, 279 F.3d 163, 174 n.6 (3d Cir. 2002).

It is a defendant's burden to establish plain error. *United States v. Olano*, 507 U.S. 725, 734-35 (1993). To satisfy this burden, a defendant must prove that: (1) the Court erred; (2) the error was obvious under the law at the time of review; and (3) the error affected substantial rights, that is,

_____

[9] "Pursuant to Fed. R. App. P. 28(i), Womack joins in the arguments of Appellant [Whitehead]." Womack Br. 22.

14

the error affected the outcome of the proceedings. *Johnson v. United States*, 520 U.S. 461, 467 (1997). If all three elements are established, the Court may, but need not, exercise its discretion to award relief. *Id.* That discretion should be exercised only in cases where the defendant is "actually innocent" or the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Olano*, 507 U.S. at 736 (quoting *United States v. Atkinson*, 297 U.S. 157, 160 (1936)).

The District Court instructed the jury as follows:

> I mentioned this before, but will reiterate again, I instruct you as a matter of law that cocaine, cocaine base, also known as crack, and heroin are controlled substances and are prohibited under federal law. It is for you to decide, however, whether the government has proven beyond a reasonable doubt that any defendant distributed a mixture or substance containing such an illegal substance.

> The evidence received in this case need not prove the actual amount of the controlled substance that was part of any alleged transaction or the exact amount of the controlled substance alleged in the indictment as distributed by the defendant. However, and you will see this when we get to the jury interrogatories, in some instances the jury interrogatories will ask you to make specific findings regarding an amount attributable or reasonably foreseeable as to the quantity of illegal substances with respect to each defendant allegedly involved in the conspiracy. Where there is such an interrogatory asking you for an amount, if you first found the defendant guilty of the charge, meaning you agreed that

15

that distribution took place, then in answering the following question about amount, this is all clearly set forth, the issue will be whether the government has proved beyond a reasonable doubt that at least the measurable amount indicated was in fact knowingly and intentionally distributed, even if it cannot prove the actual amount. So the burden of proof that the government has as to the specific amounts is, they must show at least a certain amount beyond a reasonable doubt. Again, when we go through the interrogatories, I will show you how those questions arise.

Whitehead App. 1991. The Court also specifically instructed the jury that its findings in response to the interrogatories must be unanimous and beyond a reasonable doubt. Specifically, the District Court charged the jury as follows:

Now, the evidence in this case need not prove the actual amount of the controlled substance that was part of the alleged transaction or the exact amount of the controlled substance alleged in the indictment as possessed by the defendant with intent to distribute. However, as I mentioned, in those instances where you have interrogatory findings, and you are asked to make specific findings about an attributable or reasonably foreseeable quantity of illegal substances, I'm going to direct you to the following. Where there is such an interrogatory, if and only if you found the defendant guilty of that charge, then in answering the following question about the amount, the issue is whether the government has proven beyond a reasonable doubt that at least that

16

measurable amount indicated in the interrogatory was in fact knowingly and intentionally distributed, even if it cannot prove the actual amount. Again, the interrogatory will ask you have they, beyond a reasonable doubt, proven that amount, as to that particular charge.

Now, with respect to the conspiracy charge, again in some cases you will be asked to answer questions known as jury interrogatories and to decide whether the offense involves certain weights or quantities of controlled substances. And I will ask you to follow them along. And once again, unless you find a defendant guilty of the crime, then the question as to the amount is irrelevant and need not be considered.

If you find a defendant guilty, then with respect to not only the substantive charge itself your verdict must be unanimous, but with respect to any questions about quantities of drugs your verdict must also be unanimous. All right? Which means the government must have persuaded you beyond a reasonable doubt as to any weight or quantity of the controlled substances in question. That same burden of proof applies not just to guilt or innocence, but it applies as well if there is a question about an amount.

*Id.*

Answering interrogatories, the jury found Whitehead and Womack each responsible for a conspiracy involving 280 grams or more of crack, and 500 grams or more of cocaine.

17

The jury found Womack also responsible for a conspiracy involving heroin.

The interrogatory that Womack and Whitehead challenge reads:

> Do you unanimously agree, by proof beyond a reasonable doubt, that the quantity of the mixture or substance containing a detectable amount of cocaine base ("crack") which was involved in the conspiracy and which was attributable to and/or reasonably foreseeable to the defendant was 280 grams or more?

*Id.* at 122-24 (interrogatories on the counts against Womack), 128-29 (interrogatories on the counts against Whitehead). The jury answered "yes" to this question as to both Womack and Whitehead, and "yes" to a further question asking similarly if the jury found that the quantity of (powdered) cocaine involved in the conspiracy and that was attributable to and/or reasonably foreseeable to Womack and Whitehead, respectively, was 500 grams or more.

"The jury, when determining drug quantity for purposes of the mandatory minimum [in a controlled substances conspiracy case], may attribute to a defendant only those quantities involved in violations of § 841(a) that were within the scope of, or in furtherance of, the conspiracy and were reasonably foreseeable to the defendant as a consequence of the unlawful agreement." *United States v. Williams*, 974 F.3d 320, 366 (3d Cir. 2020). "[T]he proper inquiry is to determine the *violations* of § 841(a) within the scope of the conspiracy, or in furtherance of it, that were reasonably foreseeable to the defendant as a natural result of his unlawful agreement. All drug quantities involved therein are attributable to the defendant." *Id.* at 366-67.

Womack and Whitehead argue that these interrogatories and the related jury instructions did not

18

conform to *Williams*.[10]  They request a new trial, or at least resentencing at a lower offense level.

Womack and Whitehead complain that the interrogatories asked the jury to ascertain whether "the quantity of the mixture or substance containing a detectable amount of cocaine base ('crack') *which was involved in the conspiracy and which was attributable to and/or reasonably foreseeable to the defendant* was 280 grams or more." Whitehead Br. 35 (quoting Whitehead App. 716-17) (emph. added by Whitehead).  They argue that the interrogatories did not define "involved in the conspiracy," or "attributable to . . . the defendant." *Id.* at 35.  Appellants contend that the District Court did not require the jury to "determine the *violations* of § 841(a)" whose quantities were, for each separate defendant, "within the scope of the conspiracy, or in furtherance of it," nor those which "were reasonably foreseeable to the defendant as a natural result of his unlawful agreement." *Id.* (quoting *Williams*, 974 F.3d at 366).  They further complain on appeal that the interrogatories did not require the jury to find "*both* within-the-scope (or in furtherance) *and* foreseeability, as required by *Williams* but rather allowed conviction on either one."  Whitehead Br. 35 (emph. in original).

We find the District Court did not err in its wording of the challenged interrogatories and instructions.  The interrogatories referred to the quantity of the substance containing the controlled substance "which was involved in the conspiracy *and which was attributable to* and/or reasonably foreseeable to the defendant."  Womack App. 122-24 (emph. added), 128-29 (emph. added).  As the Government points out, in context, it was made clear that in order to include an amount of crack or other illegal substance relevant to each respective defendant, the jury was required to find that it was involved in the conspiracy.  The jury was then required to determine whether the crack or other substance

---

[10] We note that *Williams* was decided in 2020, several years after appellants were convicted, and as we point out *supra*, under plain error review, a defendant must prove, among other things, that the alleged error was obvious under the law at the time of review, *see Johnson*, 520 U.S. at 467.

19

was "attributable to . . . the defendant," "reasonably foreseeable to the defendant," or both. The instructions and interrogatories clearly directed the jury that if, after finding that the particular amount of crack or otherwise was "involved in the conspiracy," the jury found that it was not attributable to the defendant and that it was not reasonably foreseeable to him, it could not be included.

The instructions and interrogatories given by the District Court as to the quantity of drugs attributable to Womack and Whitehead, respectively, did not constitute error, much less plain error. Further, even assuming arguendo the instructions or interrogatories somehow constituted error, neither Womack nor Whitehead has produced any persuasive reason to believe that the jury's quantity findings or the outcome of the proceedings would have been different with different wording of the special interrogatories or instructions or further explanations of the applicable terms consistent with applicable law. In any event, Womack and Whitehead have not met their burden of establishing that their substantial rights were affected, *i.e.*, that any error affected the outcome of the proceedings. *See Johnson*, 520 U.S. at 467.

### 3. Claims of Burton and Whitehead on Admissibility of Evidence of Firearms and Violence

Appellants Burton and Whitehead argue that the District Court erred in admitting evidence of firearms and acts of violence in the vicinity of Rose and Upland Streets during the period of the conspiracy. They contend that this evidence was unduly prejudicial and that the prejudice outweighed the probative value, in violation of Federal Rule of Evidence 403.[11]

___

[11] Although Burton's brief on appeal also mentions Fed. R. Evid. 404(b), which relates to evidence of other crimes, wrongs, or acts, he also acknowledges in his brief (and his counsel acknowledged at argument on appeal) that the issue on appeal here does not concern Rule 404(b), but rather concerns Rule 403. *See* Burton Br. 21 (pointing out that

A district court's ruling on the admission of evidence is generally reviewed for abuse of discretion. *United States v. Green*, 617 F.3d 233, 239 (3d Cir. 2010). Where the appellant did not object to the admission of evidence in the trial court, review is for plain error. *Boone*, 279 F.3d at 174 n.6.

Whitehead claims in his brief on appeal that evidence of shootings was admitted "over strenuous objection, . . . despite the District Court's finding and the Government's stipulation that the underlying 'beef' was unrelated to the drug trade." Whitehead Br. 10 (citing Whitehead App. 1771, 1178). The Government responds that none of the defendants objected to the evidence on the ground that Whitehead raises. Nonetheless, the Government argues the District Court did not abuse its discretion in admitting the challenged evidence, in any event. We agree that the District Court properly admitted the evidence of violence and firearms possession and use, and Burton and Whitehead fail to show abuse of discretion.

Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "Evidence cannot be excluded under Rule 403 merely because its unfairly prejudicial effect is greater than its probative value. Rather, evidence can be kept out only if its unfairly prejudicial effect 'substantially

---

certain caselaw "deals with Federal Rule of Evidence 404(b) or the 'prior bad acts' rule whereas the instant case deals with acts committed during the conspiracy that are (allegedly) more prejudicial than probative.") (parenthetical added). In any event, as Burton suggests, there was no violation of Rule 404(b) here, where there was no admission of "[e]vidence of any other crime, wrong, or act . . . to prove [Burton's] character," *see* Fed. R. Evid. 404(b). Rather, evidence was admitted to show the possession and use of firearms by Burton and other members of the conspiracy in furtherance of their agreement.

21

outweigh[s]' its probative value." *Cross*, 308 F.3d at 323 (quoting Fed. R. Evid. 403). Moreover, when evidence is highly probative, "even a large risk of unfair prejudice may be tolerable." *Id.* Here, the District Court properly admitted the evidence of violence and firearms possession and use, and there was no abuse of discretion.

"[T]he possession of weapons is highly probative of the large scale of a narcotics distribution conspiracy and the type of protection the conspirators felt they needed to protect their operation." *See United States v. Price*, 13 F.3d 711, 717 (3d Cir. 1994) (internal quotation marks omitted). Here, the District Court properly admitted the evidence being challenged on appeal because the danger of unfair prejudice did not substantially outweigh the probative value of the evidence under Rule 403. *See, e.g., United States v. Balter*, 91 F.3d 427, 442 (3d Cir. 1996) (District Court is afforded "broad discretion" to determine the admissibility of evidence under Rule 403).

The Second Superseding Indictment alleged multiple "overt acts" that describe members of the DTG carrying or using firearms, and storing them in common areas (such as the alleyways and other locations) for use by members of the DTG in order to protect themselves and their drug trafficking territory "[i]n furtherance of the conspiracy, and to accomplish its objects." Burton Supp. App. 10-41. Evidence of possession and use of firearms by the conspirators in this case was critical in light of the Government's theory of the case that through the use of firearms and other acts of violence, the conspirators together declared and defended their turf, such that sales of illegal drugs were not solo acts, but conduct made possible by and in furtherance of a conspiracy.

William Dorsey, a leader of the conspiracy, testified that members of the DTG stashed guns in alleyways and a nearby playground so they could be accessed by the members of the DTG and that, "[i]f someone came through shooting you could shoot back." *Id.* at 129. Dorsey identified photos of guns recovered by law enforcement and guns kept by members of the DTG, including Burton. Dorsey stated that

22

he saw various members of the DTG in possession of firearms, for the purposes he described.

Dorsey testified that a "beef" emerged between younger members of the group and "another younger crowd from a different part of town," which he and others tried to resolve because the violence was bad for business. *Id.* at 124. One incident to which Dorsey testified took place on April 17, 2013, in which Whitehead was shot in the playground that was frequented by the DTG.

Dorsey said that 10 days later, on April 27, 2013, another shooting occurred on Upland Street. Dorsey testified that he returned fire on individuals who were shooting as they drove on Upland and Rose Streets. He further testified that the shootings on April 17 and 27 were amongst others that had occurred during that time, and that he was upset about the violence because the group could not make any money with shootings going on which resulted in more police presence in the area.

After this portion of Dorsey's testimony, the Court instructed the jury:

> There has been discussion about a beef, is the term that has been used, between some people near Rose and Upland and some people from another area of Chester. Just want to make it clear, that there is no suggestion by the government that that was in any way related to the drug trade, and also want to make it clear that that is no part of the charges in this case. It is not for your consideration, other than it sets the background for what you just witnessed in terms of Mr. Dorsey's behavior on that date. . . . But whatever the underlying beef was, that is not in front of you . . . and *the government has stipulated at sidebar it was not related to any drug trade which is the subject of this case.*

23

*Id.* at 127-28 (emph. added). Dorsey then testified to a third shooting that occurred on August 21, 2013, in which he shot at a vehicle in the area.

We agree with the Government that Dorsey's testimony was highly relevant to establish the use of guns to protect the conspiracy, and that the Court also assured that the jury was instructed regarding the proper use of the evidence and the Government's stipulation. Further, as we explained in *United States v. Bailey*, 840 F.3d 99 (3d Cir. 2016), "such a stipulation mitigates the danger of unfair prejudice." *Id.* at 120 (citing *United States v. Jones,* 566 F.3d 353, 363-65 (3d Cir. 2009)). The District Court's limiting instructions here made clear to the jury that there was no suggestion by the Government that the aforementioned underlying "beef" was in any way related to the charges in this case. *See* Burton Supp. App. at 127-28; *see also Bailey*, 840 F.3d at 120.

At the trial, the testimony of several witnesses, including cooperating defendants and other witnesses, included descriptions of possession, stashing, and retrieving firearms in alleys and a playground, as well as shootings involving members of the DTG. The testimony of Dorsey, a leader of the conspiracy, clearly indicated the use and purpose of firearms for protecting and furthering the conspiracy, and the testimony of other witnesses involving firearms and violence bolstered and corroborated that testimony.

The testimony challenged by Burton and Whitehead on appeal about the possession and use of firearms was highly probative of the Government's theory that conspirators kept firearms at the ready in the area they controlled to protect the drug trafficking activity and deter interlopers, and the District Court properly gave limiting instructions to the jury where necessary in response to objections. *See Price*, 13 F.3d at 717 (acknowledging that firearms possession is highly probative of the type of protection narcotics distribution conspirators felt they needed to protect their operation).

As for prejudice, "the prejudice against which [Rule 403] guards is *unfair* prejudice – prejudice of the sort which clouds impartial scrutiny and reasoned evaluation of the facts,

24

which inhibits neutral application of principles of law to the facts as found." *United States v. Starnes*, 583 F.3d 196, 215 (3d Cir. 2009) (quoting *Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 670 (3d Cir. 2002)). Here, the evidence relating to the non-drug-related "beef," the consequent shootings, and the efforts of Dorsey, Burton, Whitehead and others to reduce the negative impact on their drug profits was relevant, probative, and not unfairly prejudicial, particularly in light of the District Court's limiting instructions to the jury. The District Court neither erred nor abused its discretion in admitting the evidence challenged on appeal.

**(B) SENTENCING CHALLENGES**

1. **Whitehead's Career Offender Status**

Whitehead argues that the District Court erred in finding that he was a career offender under Section 4B1.2 of the United States Sentencing Guidelines ("Guidelines" or "Sentencing Guidelines"). Whether a conviction constitutes a predicate career offender offense under the Guidelines is a question of law subject to plenary review. *United States v. Abdullah*, 905 F.3d 739, 743 n.6 (3d Cir. 2018).

Section 4B1.1(a) of the Guidelines states:

> A defendant is a career offender if (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

U.S.S.G. § 4B.1(a). Section 4B1.2(b) states:

25

> The term "controlled substance offense" means an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense.

*Id.* § 4B1.2(b). On appeal, Whitehead points out that the Presentence Investigation Report ("PSR") classified him as a career offender based on his having at least two prior felony convictions for controlled substance offenses in the Court of Common Pleas of Delaware County, Pennsylvania. This required his offense level to be raised from 34 to 37.

At one of the three hearings on Whitehead's sentencing, the Government introduced certified copies of state court records, which the District Court found established that Whitehead's 2000 and 2006 convictions were for offenses that each qualified as a "controlled substance offense" under Section 4B1.2(b) of the Guidelines. On appeal, Whitehead argues that the District Court erred in finding that he was a career offender. We disagree.

"We use the categorical approach to determine if a past conviction is a career offender predicate, considering only the elements of the conviction statute, not the facts of the defendant's actual misconduct." *United States v. Dawson*, 32 F.4th 254, 260 (3d Cir. 2022). "We compare the elements of that statute with the relevant Guidelines provision – here, § 4B1.2(b)'s definition of a 'controlled substance offense.'" *Id.* (citing *United States v. Williams*, 898 F.3d 323, 334 (3d Cir. 2018)). "If the statute proscribes a broader range of conduct than the Guideline, then a conviction for the state offense will not count as a controlled substance offense." *Id.*

There appears to be no dispute on appeal that this is one of a "narrow range of cases" where the court may apply

the "modified categorical approach." *See United States v. Abbott*, 748 F.3d 154, 157 (3d Cir. 2014) (citing *Taylor v. United States*, 495 U.S. 575, 602 (1990)). This approach allows a court to look beyond the elements of a prior conviction to decide if it can serve as a predicate offense. *Id.* In particular, the Court can "look beyond the face of the statute to the 'charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented' to determine which of the alternative elements was involved in the defendant's conviction." *Id.* (quoting *Shepard v. United States*, 544 U.S. 13, 16 (2005)).

"[T]he modified categorical approach may be used when a statute underlying a prior conviction 'lists multiple, alternative elements,' . . . rather than a 'single, indivisible set of elements.'" *Id.* (citing *Descamps v. United States*, 133 S. Ct. 2276, 2285, 2282 (2013)) (citations omitted). These are known as "divisible statutes." *Id.* (citing *Descamps*, 133 S. Ct. at 2281). "The purpose of the modified categorical approach is to 'help effectuate the categorical analysis when a divisible statute . . . renders opaque which element played a part in the defendant's conviction.'" *Id.* (citing *Descamps*, 133 S. Ct. at 2283).

Whitehead does not dispute that his two cited prior convictions (collectively "Predicate Offenses") were for violations of 35 Pa. Stat. § 780-113(a)(30), which prohibits a variety of drug offenses. In *Abbott*, our Court noted that 35 Pa. Stat. Ann. § 780-113(a)(30) is a divisible statute subject to the modified categorical approach. *Abbott*, 748 F.3d at 160. Thus, the District Court was entitled to consider the certified records of conviction to determine the precise offense of conviction. *See United States v. McCants*, 952 F.3d 416, 427 (3d Cir. 2020).

For each of the Predicate Offenses, each Criminal Information makes clear that the substance involved was cocaine, *see* Whitehead App. 2068, 2095, and each Certificate of Imposition of Judgment of Sentence identifies the offense as "Delivery of a Controlled Substance," *see id.* at 2050, 2075. Whitehead does not dispute the accuracy of these certified records of conviction or the propriety of the District

Court relying on state certified records for sentencing purposes in this case.

Whitehead's objection on appeal to his classification as a career offender is not based on a question about the nature of the substance involved in the prior offenses – there is no dispute that the substance involved in the Predicate Offenses was cocaine. The issue he raises is whether the conduct element of the Predicate Offenses was within the scope of what section 4B1.2(b) covers.

Whitehead contends that "the Career Offender guideline requires that the prior state offense have been for 'distribution or dispensing of a controlled substance,'" *see* Whitehead Br. 45 (citing U.S.S.G. § 4B1.2(b)), but that "'delivery,' as defined in Pennsylvania, encompasses more conduct than 'distribution or dispensing' and is therefore impermissibly 'broader,'" *id.* In particular, he argues that Pennsylvania law defines "delivery" as any "transfer [of a substance] from one person to another," and that "[d]elivery" under Pennsylvania law can exist in any of three forms: "administering," "dispensing," and "distributing." *Id.* at 45-46.

Whitehead argues that Section 780-113(a)(30) is broader than a "controlled substance offense" as defined in Section 4B1.2, because he contends Section 780-113(a)(30) prohibits *administering* a controlled substance, and a "controlled substance offense" as defined in Section 4B1.2(b) does not. His argument, however, is without merit because Section 780-113(a)(30) prohibits manufacturing or delivering a controlled substance, or possessing a controlled substance with intent to manufacture or deliver it, by unauthorized persons. It says nothing about administering drugs.

The relevant Pennsylvania statute provides:

(a) The following acts and the causing thereof within the Commonwealth are hereby prohibited: . . .

(30) Except as authorized by this act, the manufacture, delivery, or

28

> possession with intent to
> manufacture or deliver, a
> controlled substance by a person
> not registered under this act, or a
> practitioner not registered or
> licensed by the appropriate State
> board, or knowingly creating,
> delivering or possessing with
> intent to deliver, a counterfeit
> controlled substance.

35 Pa. Stat. § 780-113(a)(30). Section 780-102(b) defines "deliver" and "delivery" as "the actual, constructive, or attempted transfer from one person to another of a controlled substance, other drug, device or cosmetic whether or not there is an agency relationship."[12] *Id.* § 780-102(b). That section defines "distribute" as "to deliver other than by administering or dispensing a controlled substance, other drug, device or cosmetic."[13] *Id.* § 780-102(b). On the other hand, "Administer" is defined under Pennsylvania law as "the direct application of a controlled substance, other drug or device, whether by injection, inhalation, ingestion, or any other means, to the body of a patient or research subject." *Id.*

It appears only three of Section 780-113's subsections use the term "administer." Section 780-113(a)(30) is not one of those three subsections, all of which pertain to practitioners, their professional assistants, and other registered persons. Section 780-113(a)(13) relates to the sale, dispensing, distribution, prescription, or gift of a controlled substance to a drug-dependent person "unless said drug is

---

[12] "[T]he federal counterpart to this statute, the Controlled Substances Act (CSA), also defines the 'delivery' of a controlled substance to mean 'the actual constructive, or attempted transfer of a controlled substance,' 21 U.S.C. § 802(8)." *United States v. Glass*, 904 F.3d 319, 322 (3d Cir. 2018).

[13] The federal counterpart is nearly identical. Title 21 U.S.C. § 802(11) states that "[t]he term 'distribute' means to deliver (other than by administering or dispensing) a controlled substance or a listed chemical."

29

prescribed, administered, dispensed or given for the cure or treatment of some malady other than drug dependency," except under specified exceptions. *Id.* § 780-113(a)(13). Section 78-113(a)(14) prohibits the

> administration, dispensing, delivery, gift or prescription of any controlled substance by any practitioner or professional assistant under the practitioner's direction and supervision unless done (i) in good faith in the course of his professional practice; (ii) within the scope of the patient relationship; (iii) in accordance with treatment principles accepted by a responsible segment of the medical profession.

*Id.* § 78-1139a)(14). Finally, section 780-113(a)(35) relates to the misrepresentation of noncontrolled substances as controlled substances. Subsection 780-113(a)(35)(v)(C) exempts from its provisions "[l]icensed medical practitioners, pharmacists and other persons authorized to dispense or administer controlled substances and acting in the legitimate performance of their professional license pursuant to subclause (v)(B)." *Id.* § 78-1139a)(35)(v)(B).

Not only does Section 780-113(a)(30) say nothing about prohibiting the administration of controlled substances, but it expressly excludes the possibility that "administering," as defined in Section 780-102, falls within its scope. Since, as explained above, "administering" means applying a "direct application of a controlled substance, other drug or device . . . to the body of a patient or research subject," *see id.* § 780-102(b), by definition, it is limited to actions of practitioners or other registered persons within the context of a patient relationship or research study. Section 780-113(a)(30) expressly *excludes* actions by such persons. It prohibits "the manufacture, delivery, or possession with intent to manufacture or deliver, a controlled substance *by a person not registered under this act, or a practitioner not registered or licensed by the appropriate State board*" and excludes

30

actions "authorized by this act." *Id.* § 780-113(a)(30) (emph. added).

Whitehead's prior convictions were for violations under 35 Pa. Stat. § 780-113(a)(30). Section 780-113(a)(30) does not prohibit administering a controlled substance, and it is therefore not broader than a "controlled substance offense" in that regard under section 4B1.2 of the Guidelines. The District Court did not err in finding the Predicate Offenses constituted predicate career offender offenses under the Guidelines.

## 2. Payne's and Burton's Claims Regarding Acceptance of Responsibility

Payne and Burton argue that the District Court erred in finding that they did not qualify for a 2-level reduction in their Sentencing Guidelines offense levels for acceptance of responsibility. "Under the sentencing guidelines, a defendant is entitled to a two-level reduction to his calculated offense level if he 'clearly demonstrates acceptance of responsibility for his offense.'" *United States v. Muhammad*, 146 F.3d 161, 167 (3d Cir. 1998) (quoting U.S.S.G. § 3E1.1(a)).

We apply a clearly erroneous standard of review to the District Court's decisions that Payne and Burton were not entitled to a reduction in their offense levels for acceptance of responsibility. *Id.* "Because the sentencing judge 'is in a unique position to evaluate a defendant's acceptance of responsibility,' we give great deference on review to a sentencing judge's decision not to apply the two-level reduction for acceptance of responsibility to a particular defendant." *United States v. Barr*, 963 F.2d 641, 657 (3d Cir. 1992) (citing U.S.S.G. § 3E1.1 app. note 5).

Payne argues that although he put the Government to its burden of proof at trial, he was entitled to a reduction of his sentence under the Guidelines for acceptance of responsibility because, in a pretrial meeting with the Government, which he describes as a "proffer session," he admitted that he did distribute controlled substances, and that he also communicated this in his opening statement and closing argument at trial. The District Court found that

31

> there are charges to which Mr. Payne acknowledged responsibility, but for which – others for which he did not and the jury found him guilty most importantly in conspiracy and he also in adopting a certain strategic position at trial had the benefit of an acquittal on four counts and so weighs heavily on my decision in not finding that there was an acceptance of responsibility.

Payne Am. App. 34.

Burton argues that the District Court erred in denying a downward departure in light of the fact that he pled guilty to the individual substantive charges. In denying a downward variance for acceptance of responsibility as to Burton, the District Court noted that although Burton pled guilty to the individual substantive charges, there was no "acknowledgement globally of responsibility" in this case, since Burton proceeded to trial on the Conspiracy charge. Burton Jt. App. 60. The Court further noted that in light of the

> overwhelming evidence by way of videotape and audiotape of the controlled buys and where Mr. Burton was arrested in possession of two firearms, there's actually a tactical advantage to the pleas that he entered and I commend you for that. . . . And it's saying to the jury well, we'll admit to these things while we defend conspiracy. And so I think that as a result of that advantage, again, which was good lawyering on your part, I don't believe that acceptance of responsibility would be something that would entitle Mr. Burton to that downward adjustment.

*Id.* at 60-61.

32

Application note 2 to Guidelines section 3E1.1 provides in relevant part: "This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt . . ." The District Court's determination that Payne and Burton did not clearly show that they had accepted responsibility under section 3E1.1 was not clearly erroneous, where, among other things, Payne and Burton have never admitted that they were guilty of conspiracy, as charged in the indictment, and where they put the Government to its burden of proof at trial to establish that they participated in the conspiracy, and they were found guilty by a jury. They certainly did not "clearly demonstrate[] acceptance of responsibility for [that] offense." *See Muhammad*, 146 F.3d at 167 (quoting U.S.S.G. § 3E1.1(a)).

### 3. District Court's Calculation of Drug Quantity Attributed to Burton

Burton argues that the District Court erred in its determination of the amount of drugs that could properly be attributed to him in relation to the conspiracy. Because Burton did not raise in the District Court the grounds he raises on appeal with regard to his sentence, our review on appeal is only to ensure that plain error was not committed. *United States v. Couch*, 291 F.3d 251, 252-53 (3d Cir. 2002) (citing Fed. R. Crim. P. 52(b)).

Burton pled guilty to all 23 counts against him, except the Conspiracy charge, of which the jury found him guilty. The District Court sentenced Burton on July 6, 2018 to 300 months in prison, to be followed by a term of supervised release of eight years, and a special assessment of $1,400.

In the PSR, the Probation Office estimated, conservatively, that Burton should be held accountable for the distribution of at least 1,050 grams of crack. It estimated that the conspiracy involved at least 1,000 grams of cocaine and 200 grams of heroin. These amounts equated, under the Guidelines equivalency table, to 4149.55 kilograms of marijuana, producing an offense level of 32, increased by one

under section 2D1.2(a)(1) based on conduct in proximity to a protected location.  The advisory Guidelines range was 235 to 293 months, at the applicable criminal history category VI.

On appeal, Burton cites *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *United States v. Cotton*, 535 U.S. 625 (2002), and he argues that "the current law under [these two cases] require[s] that a sentencing factor deemed an element under *Apprendi* must be charged in the indictment and submitted to the jury."  Burton Br. 31.  In *Apprendi*, the Supreme Court held that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt. In federal prosecutions, such facts must also be charged in the indictment."  *Cotton*, 535 U.S. at 627 (internal quotation marks and citations omitted).

Here, Burton does not argue that his sentence was "beyond the prescribed statutory maximum," much less demonstrate that it was.  Indeed, the Government argues that the statutory maximum for Burton's many offenses measures in the hundreds of years.  In any event, since Burton does not argue that the sentence imposed here exceeded the statutory maximum for Burton's conviction, any claim of an *Apprendi* violation is without merit.  *See, e.g., United States v. Williams*, 235 F.3d 858, 862-63 (3d Cir. 2000); *United States v. Cepero*, 224 F.3d 267, n.5 (3d Cir. 2000) (en banc) ("Because application of the Sentencing Guidelines in this case does not implicate a fact that would increase the penalty of a crime beyond the statutory maximum, the teachings of [*Apprendi*] are not relevant here.").[14]

---

[14] In his brief on appeal, *see* Burton Br. 32, Burton also cites *United States v. Miele*, 989 F.2d 659 (3d Cir. 1993), where our Court found that evidence of drug quantity considered at sentencing must have a sufficient indicia of reliability to support its probable accuracy.  *Id.* at 668; *see also United States v. Paulino*, 996 F.2d 1541, 1545 (3d Cir. 1993) (acknowledging that "in calculating the amount of drugs involved in a particular operation, a degree of estimation is sometimes necessary").  Here, Burton offers no argument about the unreliability of any evidence considered by the District Court at sentencing.

On appeal, Burton also complains that the PSR's mathematical calculations appear to be inconsistent. *See* Burton Br. 30 (citing PSR ¶ 268). In particular, he notes that in one paragraph of the PSR, it found that, according to the trial testimony, several co-conspirators generally purchased 7 to 14 grams of crack every 3 to 5 days, and that using a conservative estimate that defendant distributed crack on 75 days and sold 7 grams per day, the defendant would have been responsible for distribution of approximately 525 grams of crack. Therefore, conservatively taking into account that Burton conspired to distribute drugs with at least one other person, the PSR found he should be held accountable for the distribution of at least 1,050 grams of crack.

Burton correctly points out that if a conspirator purchased 7 to 14 grams every 3 to 5 days, the most conservative view would be that a conspirator purchased 7 grams every 5 days, meaning that during a 75-day period a conspirator would purchase and be responsible for the distribution of 105 grams of crack, not 525 grams. *See id.* at 30. While acknowledging this as well, the Government responds that, based on the trial evidence, the record supports a conservative estimate well in excess of the quantity assessed in the PSR. We agree.

At trial, there was extensive testimony about the quantities of cocaine and heroin that Dorsey supplied to members of the DTG, including Burton. The evidence indicated that Burton resold that cocaine in the form of powder cocaine or crack in bulk quantities to other members of the DTG for resale in the Rose and Upland neighborhood. Dorsey testified that between August 2012 and September 2014, he and other members of the DTG sold drugs in the Rose and Upland area: "between dime and 20 sales - $10 and $20 sales" of "crack and powder cocaine" and that drugs were sold in the area all day, seven days per week. Burton Supp. App. 99-101.

The testimony indicated that during the time of Burton's participation in the conspiracy, he was selling cocaine, crack, and heroin, along with his co-defendants. Officer Timothy Garron testified to frequently seeing Burton

with co-defendants Charles Stansbury, Kareem York, JaVaughn Anderson, Whitehead, Jamear McGurn, and Edwards in the neighborhood playground, particularly in March and April of 2013. *Id.* at 162. Officer Garron's testimony also indicated that he observed Burton and these other DTG members engaging in what he believed, based on his knowledge and experience, to be drug sales in the alleyways of the Rose and Upland area, on a near-daily basis. *Id.* at 164-68. The testimony was corroborated with pole camera footage showing Burton and his co-conspirators in these areas. *Id.*

A civilian witness also testified to purchasing crack from Burton as much as three to four times per week over the course of several months. *Id.* at 190-91. Her testimony indicates that she purchased between $40 and $200 worth of crack from Burton on these occasions, and pole camera footage of two of those purchases was played for the jury during her testimony. *Id.*

Co-conspirator Anderson testified that Burton was selling him approximately a half-ounce to an ounce of crack per day when they were together in the Rose and Upland area from approximately February 2013 to April 30, 2013. *Id.* at 312-13. Anderson testified that he purchased "eight-balls" (3.5 grams) to quarter-ounces (7 grams) of crack from Burton, which Anderson would resell within three to four days. *Id.* He also identified multiple other individuals who were selling drugs with him in the area. *Id.*

Anderson testified that he observed Burton selling crack and heroin. *Id.* at 313. With regard to crack, Anderson testified that he observed Burton selling at least a half to an ounce, "which is 28 grams, and a half is 14 grams," and he testified he observed Burton sell a "half ounce of crack" (14 grams) "on a daily basis." *Id.* Anderson also testified that he observed Whitehead supply Burton with an ounce (28 grams) of crack on each of approximately four or five separate occasions. He also witnessed Burton supply a particular juvenile with a "ballgame, 3.5 grams" of crack on approximately four occasions, and co-conspirator Erven Towers-Rolon with approximately 14 grams of crack on at least three occasions. *Id.* at 313-14. Anderson also observed

Burton supply Stansbury with approximately 3.5 grams of crack on at least two occasions. *Id.*

Based on the trial evidence, the record supports a conservative estimate well in excess of the aforementioned quantity assessed in the PSR for which Burton could be held accountable. Moreover, as the Government points out, in taking into account that Burton conspired to distribute drugs, it appears the Probation Office was also extremely conservative in simply doubling its quantity attributable to Burton, as if only one other confederate sold on behalf of the DTG. Burton cannot establish on the existing record that the District Court committed plain error in the drug quantity it attributed to him in relation to the conspiracy.

### 4. Burton's Claim for Minimal Role Reduction at Sentencing

Burton argues that the District Court erred in not granting a reduction in his offense level under the Sentencing Guidelines for a "mitigating role." Burton Br. 35. As we have previously clarified:

> We employ a mixed standard of review when considering whether a defendant was entitled to a base level reduction for being a minimal or minor participant in the criminal activity. When the district court's denial of a downward adjustment is based primarily on a legal interpretation of the Guidelines the defendant claims to be erroneous, we exercise plenary review. By contrast, when the defendant takes issue with the district court's denial of a reduction for being a minimal or minor participant which was based primarily on factual determinations, we review only for clear error.

*United States v. Carr*, 25 F.3d 1194, 1207 (3d Cir. 1994) (citations omitted). Here, the challenge is factual and

reviewed for clear error. Burton "bears the burden of demonstrating that other participants were involved and that under the [applicable standards] and the facts of his particular case, the minor role adjustment should apply." *United States v. Isaza-Zapata*, 148 F.3d 236, 240 (3d Cir. 1998).

Section 3B1.2 of the Guidelines provides:

> Based on the defendant's role in the offense, decrease the offense level as follows:
>
> > (a) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.
> >
> > (b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels.
>
> In cases falling between (a) and (b), decrease by 3 levels.

U.S.S.G. § 3B1.2. The commentary states: "This section provides a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant in the criminal activity." *Id.* § 3B1.2 app. note 3(A). The commentary further states:

> Subsection (a) applies to a defendant described in Application Note 3(A) who plays a minimal role in the criminal activity. It is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group. Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant.

38

*Id.* § 3B1.2 app. note 4.

District courts "are allowed broad discretion in applying [section 3B1.2], and their rulings are left largely undisturbed by the courts of appeal." *Isaza-Zapata*, 148 F.3d at 238. In determining whether a role adjustment is warranted, courts should consider, among other factors: "(1) the defendant's awareness of the nature and scope of the criminal enterprise; (2) the nature of the defendant's relationship to the other participants; and (3) the importance of the defendant's actions to the success of the venture." *United States v. Brown*, 250 F.3d 811, 819 (3d Cir. 2001).

Here, after hearing argument and considering the evidence, the District Court explained:

> I'm going to decline to reduce the offense level on the basis of minimal involvement in part because it was the theme of the defense at trial and the jury rejected the idea that Mr. Burton was not involved beyond a reasonable doubt, a much more onerous standard. I have . . . [a] 78 page presentence investigation report and mindful of the argument that it was a minor role, went back and read in detail through the summation of the evidence which included the controlled buys, the surveillance and based upon that, I am persuaded that although Mr. Burton's involvement was less than some of the other conspirators, he cannot properly under the guideline be considered a minimal role in the conspiracy, and I think the chronological argument is undercut in two respects. First on the front end, before controlled buys start, there's obviously investigation which I recall from the trial showing Mr. Burton's involvement to identify himself as someone to whom – from

whom controlled buys would be made. And then on the back end, it was the arrest with the firearms that terminated his involvement.

. . . I am ultimately not persuaded and so, I will deny a downward reduction on that basis.

Burton Supp. App. 519.

The evidence supports the District Court's denial of a reduction in Burton's offense level under the Guidelines for a mitigating role. He pled guilty to 23 counts, including firearms charges and distribution of crack and heroin within the Rose and Upland area. The evidence indicated he was aware of the nature and scope of the drug enterprise, and as the District Court pointed out, the jury found the evidence proved beyond a reasonable doubt that Burton's defense of a minimal or minor involvement in his participation of the conspiracy was without merit.[15] Indeed, William Dorsey, Braheem Edwards, Naim Butler, and JaVaughn Anderson testified that Burton regularly interacted with leaders of the conspiracy, and evidence such as pole camera footage showed Burton with the other DTG members in the Rose and Upland area engaging in drug sales. Dorsey and Edwards each testified to supplying Burton with bulk quantities of crack and heroin for redistribution. *Id.* at 106-07, 489-90. Burton is unable to show clear error in the District Court's finding that he was not entitled to a reduction in sentencing under section 3B1.2 of the Guidelines for his role in the offense.

### 5. Womack's Sentence Enhancement for Firearms Possession in Furtherance of Conspiracy

Appellant Womack argues that the District Court erred in applying the 2-level enhancement under Guidelines section

---

[15] As mentioned *supra*, Appellants do not argue on appeal that there was insufficient evidence to support the convictions.

2D1.1(b)(1) for possession of a dangerous weapon in connection with the conspiracy offense. The question whether a dangerous weapon was possessed in connection with the offense is reviewed for clear error. *United States v. Demes*, 941 F.2d 220, 222-23 (3d Cir. 1991).

Section 2D1.1(b)(1) of the Guidelines imposes a 2-level sentence enhancement if "a dangerous weapon (including a firearm) was possessed." Also, Guidelines section 1B1.3(a)(1)(B) states that "in the case of a jointly undertaken criminal activity[,] all reasonably foreseeable acts . . . that occurred during the commission of the offense of conviction" are considered to be part of relevant conduct.

Here, Womack does not dispute that the Rose and Upland DTG used and possessed firearms in furtherance of the conspiracy. He contends that the evidence was insufficient to establish that he knew, or had reason to know, that his co-conspirators were in possession of a firearm. The District Court rejected Womack's arguments, and found that the enhancement was warranted.

In denying Womack's objection to the enhancement, the District Court pointed out Womack's personal history with firearms and drug dealing as pertinent to whether it would be reasonably foreseeable to him that this relatively large enterprise engaging in these quantities of drugs would involve weapons. In addition to being convicted in 1986 for drug possession with intent to deliver and being arrested for carrying a firearm during that time period, the District Court pointed to Womack pleading guilty in federal court to a conspiracy to rob a competing drug dealer, where that conspiracy involved supplying a cooperating witness with a firearm that did not have a serial number.

The Court further pointed to the testimony of JaVaughn Anderson about a conversation between Womack and Dorsey wherein Womack was bemoaning the fact that there was gunplay at Rose and Upland, because he said that was bad for business. *See* Womack App. 1722-24 (Anderson relaying a conversation he heard between Dorsey and Womack about the need to retaliate against interlopers by "shooting back" because the interlopers were "making it hard

41

to make money."). The Court also noted the close relationship between Dorsey and Womack, and the evidence, including videotape evidence of Dorsey discharging a firearm on the streets. *Id.* at 872 (Dorsey testifying about his "close" relationship with Womack, who was "family," and revealing that "we talked about everything"), 1717-18 (Anderson testifying that Womack was Dorsey's older cousin).

Based on Womack's personal experience with drug dealing and guns, Womack's close relationship with Dorsey, the testimony that Womack and Dorsey had a conversation about the shootings occurring in the Rose and Upland area, and the evidence of firearm possession and use by Dorsey and other DTG members, the District Court found it was reasonably foreseeable to Womack that members of the conspiracy would possess and use a firearm in furtherance of the purposes of the conspiracy. *Id.* at 2227-29. Based on the totality of the evidence before the District Court at sentencing, we find no error, much less clear error, in the District Court's determination that the 2-level enhancement under Guidelines section 2D1.1(b)(1) applies.

## III.

For the foregoing reasons, we affirm the Judgments of conviction and sentence of Appellants.